**FORD MOTOR COMPANY, Defendant, Appellant,**

v.

**WEBSTER'S AUTO SALES, INC., Plaintiff, Appellee.**

No. 6530.

United States Court of Appeals First Circuit.

June 13, 1966.

Claude R. Branch and Will J. Bangs, Boston, Mass., with whom J. Michael Guenther, Dearborn, Mich., and Choate, Hall & Stewart, Boston, Mass., were on brief, for appellant.

Harold M. Willcox, Boston, Mass., with whom Robert E. Sullivan and Herrick, Smith, Donald, Farley & Ketchum, Boston, Mass., were on brief, for appellee.

Before ALDRICH, Chief Judge, J. WARREN MADDEN*, Judge of the Court of Claims, and JULIAN, District Judge.

Substituted Opinion of the Court.

MADDEN, Judge.

The plaintiff, Webster's Auto Sales, Inc., is a corporation engaged primarily in the business of selling various makes of used automobiles. Its place of business is a used car lot in Indian Orchard, which is a part of Springfield, Massachusetts.

The Ford Motor Company has a Boston District Sales Office with jurisdiction over 290 dealers throughout a six-state New England area. "Company cars" or "factory Fords" are new Fords which have been used only by Ford employees. Factory Fords used in the Boston District are driven in the six-state area for company purposes in connection with the sale of new cars and are ultimately sold by the Boston office to its dealers as used cars. Some factory Fords may be brought in from other districts for sale in the Boston District.

Beginning in 1954 plaintiff purchased factory Fords from authorized Ford dealers for resale from its used car lot. In the calendar years 1959 and 1960 slightly over half of plaintiff's gross profit was derived from resale of factory Fords obtained from Ford dealers. Plaintiff

---

* Sitting by designation.

testified that he also purchased "slight" numbers of other nearly new cars from other sources such as car-rental companies and the American Red Cross.

Plaintiff purchased most of its factory Fords from one dealer, Harr Motor Company of Worchester, Massachusetts. Plaintiff's practice was to inspect cars to be sold at the Ford factory lot in Natick, Massachusetts, and then give Harr Motor a figure that it would pay for selected cars. Harr Motor would then bid on the cars and, if successful, sell the cars to the plaintiff at $50 more than it had paid Ford for them.

In August, 1960, plaintiff bought forty factory Fords through Harr Motor Company. These cars appeared on plaintiff's lot in Springfield and led shortly to a complaint by Automobile Sales Company, an authorized Ford dealer in Springfield. The complaint was made in person by Mr. Joseph Kossick and his sons William and Daniel of Automobile Sales Company to defendant's Boston District Sales Manager, Mr. Boutelle, at defendant's District Sales Office. At the meeting Mr. Kossick related the presence of the factory Fords on plaintiff's lot and said that Automobile Sales was not happy about their presence there. He asked what defendant could do about seeing to it that no more factory Fords found their way to plaintiff's Springfield lot. Mr. Boutelle acknowledged that the situation was not good for Automobile Sales and directed the officer in charge of distribution of factory Fords, Mr. Saunders, to "correct the situation."

The distribution procedures used by the Boston District in 1960 were as follows. The defendant, from its Michigan headquarters, would notify the Boston District when to sell its company cars and replace them with new ones. The District Office would then compile a list of the cars to be sold and send the list, with a letter inviting bids, to certain Ford dealers in the District. The highest bidder would get the cars. In 1960 factory Fords were offered for sale about four times a year. The bidding was open only to defendant's authorized new car dealers.

About three weeks after Automobile Sales complained to defendant another group of factory Fords became available for sale, and bids were called for by a letter from defendant to all dealers at that time on the bidders' list used by the District Office. The plaintiff's case is based upon the claim that the concluding paragraph of this letter, first sent on September 22, 1960, and repeated verbatim in subsequent bid letters dated June 2, 1961, June 19, 1961, and December 5, 1961, resulted in an agreement in violation of section 1 of the Sherman Act, 26 Stat. 209, 15 U.S.C. § 1, between defendant and its dealers which prevented plaintiff from obtaining as many factory Fords as it otherwise would have obtained and thereby caused plaintiff to lose the profits which would have been realized by reselling them. The paragraph of the letter read as follows:

We ask that a dealer not bid on these units for the purpose of reselling them to a wholesaler. It has been brought to our attention that large quantities of units have been resold to used car dealers in towns other than that of the purchasing dealer. In the future, this situation cannot be tolerated.

Following the first mailing of this letter on September 22, 1960, Mr. Daniel Kossick discussed the letter with Mr. Saunders at the District Sales Office and stated that he was "in agreement" with its terms. Between the time of the first letter and the end of 1961, a number of dealers receiving bid letters sent back their bids on the original letter which had been sent by defendant without further comment on the language of the letter.

Shortly after sending the letter in September, 1960, Mr. Saunders had a conversation with Mr. Dow, General Manager of Harr Motor Company. Mr. Saunders explained that the last paragraph in the letter had been inserted because Harr's sales of factory Fords to an Indian Orchard used car dealer was disrupting

the market in Springfield and a Springfield dealer had complained about the cars appearing on the Indian Orchard lot. Mr. Dow, however, indicated at that time that Harr Motor did not intend to stop selling to wholesalers such as plaintiff and that his company would continue to do whatever it pleased with any cars bought from defendant.

Several months after the first mailing of defendant's letter, plaintiff's purchases of factory Fords declined sharply. In support of its contention that this decline was caused by defendant's allegedly illegal conduct, plaintiff testified as to the verbal refusals or equivocal conduct of three Ford dealers from whom he attmpted to purchase factory Fords following defendant's letter; and he offered evidence to show that the refusal to deal or the equivocal conduct of these dealers was influenced by the letter.

Plaintiff sought to show the economic effect of defendant's letter upon his business through evidence indicating the sharp decline in purchases of factory Fords following defendant's letter, an equivalent decline in gross profits upon factory Fords, the resultant decline in total gross profits, and the effect upon net profit.

The first trial in this action resulted in a jury award of 5000 dollars to plaintiff. Defendant's motion for a directed verdict was subsequently denied, as was defendant's motion for judgment notwithstanding the verdict. Defendant's motion for a new trial, however, was granted as to the issue of damages only. The second trial, on the damage issue alone, resulted in an award to plaintiff of 4000 dollars. From this judgment and from the denial of defendant's motions for a directed verdict and judgment notwithstanding the verdict at the end of the second trial the defendant appeals. We affirm.

Section I of the Sherman Act proscribing every "contract, combination, or conspiracy" in restraint of trade is directed only at joint action. Fundamental, then to any section 1 violation is the finding of an agreement between two or more parties. Only those agreements which work unreasonable restraint upon interstate commerce are prohibited by the Act. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). At the same time certain kinds of agreements have been determined to be *per se* unreasonable and not susceptible of justification under rule of reason tests. Thus, agreements aimed at fixing prices, whether horizontal agreements between potential competitors or vertical agreements between primary suppliers and those who purchase for resale, are illegal *per se*. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (horizontal agreement); Dr. Miles Medical Co. v. John D. Park & Sons, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911); United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) (vertical agreements). Group boycotts and concerted refusals to deal have long been in the unreasonable-by-law category, Fashion Originators' Guild of America v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); Klor's v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), as have been horizontal agreements among competitors to divide markets territorially. Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899).

Plaintiff alleges that defendant here has agreed with others upon a course of conduct which constitutes both an unlawful refusal to deal, or group boycott, and an unlawful territorial division of markets. As conduct of either type would be unreasonable as a matter of law, plaintiff contends that no question as to the reasonableness of the restraint of trade resulting from defendant's conduct is presented and has offered no evidence to show that as a matter of fact defendant's actions have caused the public injury which is a necessary element of Sherman Act violations in non-*per se* cases. As plaintiff presents its case, then, we would have to find not only that the jury below

could reasonably have found an agreement between defendant and its dealers, but that the agreement was of the kind subject to absolute prohibition under section 1.

Ford in its defense relies upon the doctrine of United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919) that:

> In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell.

The evidence here, defendant contends, establishes no more than a unilateral declaration of future policy coupled with the acquiescence of some of its dealers, which, under Colgate, does not suffice to establish a "contract, combination or conspiracy" within the meaning of section 1.

The Colgate doctrine that a manufacturer has the theoretical right to "announce in advance the circumstances under which he will refuse to sell," and to stop dealing with a distributor for "reasons sufficient to himself," has in practice offered little protection to manufacturers from the finding of tacit agreements to which section 1 could apply. Whatever protection may at first have been thought provided by Colgate has been progressively eroded in subsequent cases. In the latest, United States v. Parke, Davis & Co., supra, the immunity of the Colgate doctrine was limited to a bare announcement of future policy coupled with a simple refusal to deal, and the Court cautioned that when a manufacturer goes beyond a simple refusal to deal in attempting to effect compliance with announced policies, the necessary element of agreement may be found. United States v. Parke, Davis & Co., supra, 362 U.S. at p. 44, 80 S.Ct. 503.

■ As long as Colgate has any life in it,[1] however, a simple announcement of policy followed by customer acquiescence based solely on the individual self-interest of the customer in continued dealings with the manufacturer is not an agreement within the reach of the Sherman Act. This is true even though it is recognized that there is no difference in economic effect between adherence to a manufacturer's policy effected by prohibited agreement and adherence effected by conduct within the narrow safety zone offered by Colgate. United States v. Parke, Davis & Co., supra, at p. 44, 80 S. Ct. 503.

■ Plaintiff contends that the record in this case establishes that defendant went beyond the permissible bounds of Colgate in attempting to impose the resale restrictions challenged here. As we have seen, Mr. Kossick, a representative of Automobile Sales Company, one of defendant's dealers in Springfield, Massachusetts, complained in person to defendant's Boston District Sales Manager about the presence on a Springfield used car lot of factory Fords originally sold by defendant to a dealer in a town other than Springfield. Defendant's Sales Manager directed his assistant "to correct the situation." Correction was subsequently attempted through a letter from defendant to all of its dealers who were allowed to bid on factory Fords, notifying them not to resell to persons such as the plaintiff. Mr. Kossick later discussed the letter with defendant's Sales Manager and stated that he was "in agreement" with the message it contained. Defendant's subsequent letters, soliciting bids on factory Fords contained the same message. This sequence of events constituted an agreement between defendant and Automobile Sales

1. See Dart Drug Corp. v. Parke, Davis & Co., 120 U.S.App.D.C. 79, 344 F.2d 173 (1965); Klein v. American Luggage Works, Inc., 323 F.2d 787 (3rd Cir. 1963); Graham v. Triangle Publications, Inc., 233 F.Supp. 825 (E.D.Pa.1964), aff'd per curiam, 344 F.2d 775 (3rd Cir. 1965); Tobman v. Cottage Woodcraft Shop, 194 F.Supp. 83 (S.D.Cal.1961).

Company to restrict the resale of factory Fords. The essential fact is that defendant's action in imposing the restrictions was not unilateral but was instigated by one of its dealers and cannot, therefore, be said to fall within the rule of Colgate. The record, then, shows an agreement between defendant and one of its dealers which, standing alone, would be subject to scrutiny under section 1 of the Sherman Act. The record, however, further discloses a wider agreement.

When defendant, at the instigation of one of its dealers, sought to impose resale restrictions on all of its dealers, it entered the "announcement plus" area which, coupled with evidence in this record of dealer compliance, constitutes a wider agreement. There was a series of writings sent to all Ford dealers requesting that factory Fords not be sold to wholesalers such as plaintiff. The record further shows the return of bids by Ford dealers on the very letters which requested the resale restrictions, and in some cases actual discussions with dealers concerning the terms of the letter, though there is no evidence that the restrictions themselves were discussed specifically. Following defendant's letter, which was repeated in three later mailings, several Ford dealers from whom plaintiff sought to obtain factory Fords either refused to sell to him or responded equivocally and evasively to his requests to buy.

Defendant contends that any refusal of these dealers to trade with plaintiff is action pursuant to independent decisions of the dealers acting in their own self-interest and is at most the kind of "conscious parallelism" of business behavior which has been held beyond the reach of the Sherman Act. Theatre Enterprises, Inc. v. Paramount Film Distributors Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954).

Whether plaintiff's inability to obtain factory Fords from these dealers was the result of individual business decisions or reflected an agreement with defendant was a matter for the jury to decide. We cannot say on this record that a finding that these dealers acted pursuant to an agreement with defendant was clearly erroneous. The short of the matter is that defendant's announcement of restrictions on the resale of factory Fords was not a unilateral action within the scope of the Colgate doctrine, and the record supports a conclusion that the subsequent refusals of certain dealers to deal with plaintiff were not business decisions independently reached and motivated solely by self-interest, but that the conduct of these dealers was a manifestation of a series of vertical agreements with defendant.

Plaintiff further contends that the record shows a horizontal agreement between dealers themselves. The distinction between vertical and horizontal agreements is important here because the kinds of non-price-fixing restrictions involved have in the past been subject to *per se* invalidity only when an agreement between parties standing in horizontal relationship to each other has been found. Addyston Pipe & Steel Co. v. United States, supra; Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S. Ct. 971, 95 L.Ed. 1199 (1951). Clearly, there is no evidence here of a direct horizontal agreement among dealers. Plaintiff, however, argues that a tacit horizontal agreement among dealers is implied from the vertical relationships existing between defendant and dealers individually. To bridge the gap between a series of vertical agreements and one vertical-horizontal agreement joining defendant and all complying dealers, plaintiff relies upon language in Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939), and United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942), identifying "conscious parallelism" of dealers in reaction to a manufacturer's resale-price maintenance program with conspiracy in the price-fixing context of those cases. In Interstate Circuit the Court stated at 306 U.S. at 227, 59 S.Ct. at 474:

Acceptance by competitors, without previous agreement, of an invitation

to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act. Earlier, in Dr. Miles Medical Co. v. John D. Park & Sons Co., supra, the Court also identified a series of vertical restraints with a single horizontal restraint in the context of resale price maintenance. In declaring vertical price maintenance agreements illegal *per se* the Court stated that a manufacturer could fare no better by imposing a system of identical contracts on its distributors and dealers than could the distributors themselves "if they formed a combination and endeavored to establish the same restrictions, and thus to achieve the same result, by agreement with each other." Dr. Miles Medical Co. v. John D. Park & Sons Co., supra, 220 U.S. at 408, 31 S.Ct. at 384.

▋ Since even vertical price maintenance has been declared illegal *per se*, it may be justified to say that dealers who enter into vertical price-maintenance agreements with the knowledge that their agreement is part of a plan to limit price competition at the retail level have also joined in a horizontal conspiracy with all participating dealers. But the Supreme Court has recently left open the question whether territorial and customer restrictions vertically imposed are subject to a *per se* rule. United States v. White Motor Co., 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed. 2d 738 (1963). Unlike price-fixing agreements, which experience has proven to be utterly void of justification regardless of the form in which they appear, there may in some circumstances be sufficient justification for territorial and customer restrictions vertically imposed to make *per se* prohibition inapplicable. United States v. White Motor Co., supra, at 263, 83 S.Ct. 696. At this stage we would be slow to infer a horizontal conspiracy from evidence of parallelism in this non-price-fixing context. "Conscious parallelism" in business behavior has not yet been held to be *per se* conspiratorial conduct. Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,

supra. This record offers nothing more to suggest a horizontal agreement among dealers.

While plaintiff rested its case entirely upon allegations of horizontal conspiracy in order to bring it within existing categories of *per se* violations under section 1, the recent decision in United States v. White Motor Co., supra, and United States v. General Motors, 86 S.Ct. 1321 (U.S., April 28, 1966), indicate that the vertical agreements we find here may also fall within the automatically proscribed category. White Motor Company allowed its dealers to sell only to buyers having a place of business within the dealer's exclusive territory. The dealers were also prohibited from selling to certain defined classes of large-account customers. The Government argued that these restrictions so closely resembled the *per se* violation of horizontal market division that they should be subject to the same absolute prohibition. The District Court accepted the Government's contentions and granted a motion for summary judgment on the ground that White's restrictions were *per se* violations of the Sherman Act. United States v. White Motor Co., 194 F.Supp. 562 (N.D.Ohio 1961). The Supreme Court reversed and remanded the case for trial, intimating "no view one way or the other on the legality of such an arrangement." White Motor Co. v. United States, supra, 372 U.S. at 261, 83 S.Ct. at 701. The Court, after noting that horizontal territorial limitations, like group boycotts or concerted refusals to deal, are naked restraints of trade with no purpose except stifling of competition, stated at 263, 83 S.Ct. at 702:

A vertical territorial limitation may or may not have that purpose or effect. We do not know enough of the economic and business stuff out of which these arrangements emerge to be certain. * * * We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a "pernicious effect on competition and lack * * *

any redeeming virtue" (Northern Pac. R. Co. v. United States [356 U. S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545] (1958)) and therefore should be classified as *per se* violations of the Sherman Act.

The same question is present here—whether the vertical agreements in this case have any justification which would warrant treating them differently from their horizontal counterparts. In some respects the agreements resemble those whose validity was questioned but not determined, in White Motor Co., for they prohibit a dealer in one territory from selling to customers, used car dealers, in another dealer's territory and thus shield the dealer from potential competition of local sales of factory Fords. The agreements here, however, go beyond the attempt to keep dealers geographically in their place and have as their objective the total elimination of one class of Ford competitor. Defendant argues, however, that even if the conduct here is seen to result in a series of vertical agreements with certain of its dealers, the agreements do have "redeeming value" and are, therefore, outside the *per se* violations of the Sherman Act. The record shows that factory Fords were often very late model used cars, sometimes sold within the current year. To permit a used car dealer to sell these nearly new Fords, defendant contends, would amount practically to the operation of an unfranchised Ford dealership in competition with franchised dealers and, thus, disrupt its established system of distribution.

■ We find that the Supreme Court's recent decision in United States v. General Motors, supra, puts to rest any contention that a manufacturer, through agreements with its dealers, may seek to exclude a class of competitors from the market in the name of preserving a system of distribution.[2] In holding that the combination of General Motors and certain of its dealers, for the purpose of restraining the sale of new Chevrolets through discounters, violated section 1 of the Sherman Act, the court stated:

Exclusion of traders from the market by means of combination or conspiracy is so inconsistent with the free-market principles embodied in the Sherman Act that it is not to be saved by reference to the need for preserving the collaborators' profit margins or their system for distributing automobiles. * * * " Id. 86 S.Ct. at 1331.

The conspiracy involved in General Motors fell within the classic pattern of the group boycott in restraint of trade—a single, vertical-horizontal agreement to which the manufacturer and all collaborating dealers were parties. In discussing the cases in which the *per se* doctrine had been developed in a boycott context,[3] the court stated:

The principle of these cases is that where businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation underlying their conduct. Ibid.

■ In light of the court's broad condemnation of the exclusionary purpose of the kind of conspiracy involved in General Motors, we find no controlling significance in the fact that such a boy-

2. The Government has never challenged the validity of exclusive dealerships, as such, as upheld in Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App. D.C. 161, 243 F.2d 418 (1957), cert. denied 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed. 2d 38 (1957), and Schwing Motor Co., Inc. v. Hudson Sales Corp., 138 F.Supp. 899 (D.C.D.Md.1956), aff'd per curiam, 239 F.2d 176 (4th Cir. 1956), cert. denied 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957). The Government in the White Motor Co. case did not attack the validity of the White franchise even though it granted dealers exclusive selling rights within their territories.

3. The court referred to Northern Pac. R. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), Fashion Originators' Guild of America, Inc. v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), and Eastern States Retail Lumber Dealers' Assn. v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914).

cott takes its shape and strength from a series of vertical agreements rather than from a single vertical-horizontal agreement. In both cases there is an "agreement" within the terms of section 1. In both cases the purpose of the agreement —"to deprive others of access to merchandise which [they] wish to sell to the public"—falls within the category of agreements "which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable * * * " [4] We hold the agreements between defendant and its collaborating dealers to be *per se* violations of the Sherman Act.

It remains to inquire whether plaintiff has adequately shown that it suffered legal injury and incurred damages in some ascertainable amount as a result of defendant's unlawful conduct. As stated by the court in E. V. Prentice Machinery Co. v. Associated Plywood Mills, Inc., 252 F.2d 473, 477 (9th Cir. 1958), cert. den. 356 U.S. 951, 73 S.Ct. 917, 2 L.Ed.2d 844 (1958):

Regarding the quantum of proof required to establish the fact of damage, the rule is that the plaintiff is required to establish with reasonable probability the existence of some causal connection between defendant's wrongful act and some loss of anticipated revenue.

This court has required that the causal relationship between defendant's misconduct and plaintiff's injury be shown with a "fair degree of certainty." Momand v. Universal Film Exchanges, 172 F.2d 37, 43 (1st Cir. 1948).

The legal injury plaintiff alleges here is loss of profit resulting from a reduction in the number of factory Fords it was able to obtain from dealers in the period following defendant's letter, compared with the number it had been able to obtain prior to the letter. Plaintiff contends that the fact of damage was shown by its continued efforts to obtain factory Fords during this period, by the continued sale of factory Fords by defendant's Boston District Sales Office, and by its failure to obtain more than a fraction of the number of such cars that it had previously been able to buy.

The validity of this contention turns upon whether the decline in plaintiff's purchases of factory Fords can be traced to compliance with the demands of defendant's letter on the part of plaintiff's potential suppliers of the used cars. As almost all of plaintiff's purchases prior to defendant's letter were made from one dealer, this inquiry actually narrows to the question whether that dealer, Haar Motor Company, joined in the conspiracy to the detriment of the plaintiff.

The record indicates that Haar Motor Company initially rejected defendant's demand that it stop selling factory Fords to used car dealers.[5] Plaintiff, however, contends that, at least by January, 1961, Haar had changed its attitude and fallen in line with defendant's attempt to restrict plaintiff's access to the cars. In support of this contention plaintiff introduced the following evidence.

1. Haar Motor Company did not inform plaintiff of the first 1961 bidding on factory Fords, called for on January 6, 1961, although Haar had in the past informed plaintiff when the cars were coming up for sale.

2. Plaintiff called Dow of Haar Motor on February 3 or 4 to inquire about the next sale of factory Fords, and Dow informed him at that time that the next sale was coming up in the last part of February. Plaintiff was planning a trip which he was willing to postpone if the bidding was to take place prior to his anticipated return late in February, but he left town as scheduled when told by Dow that the bidding was not until late in the month. In fact, the bidding was called for on February 6, two or three

---

4. Northern Pac. R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed. 2d 545 (1958).

5. The record indicates that Harr Motor Company's initial reaction to defendant's letter of September 22, 1960, was to inform defendant that it would continue "to do whatever [it] pleased" with factory Fords it obtained.

days after Dow had informed plaintiff that bidding was to be late in February. As a consequence, plaintiff was unable to bid.

3. The third 1961 bidding was called for by defendant's letter of June 7. Plaintiff learned of this bidding from Dow approximately June 9 when plaintiff visited Haar Motor Company in Worcester to inquire about future bids. Plaintiff testified that when he asked Dow when the next factory Fords were to be sold Dow replied, "Perley, I am sorry I cannot sell you those cars any more. We received a letter with the bid which forbids us from selling them." [6]

4. Approximately two days after the conversation with Dow on June 9, plaintiff returned to Worcester to see if he could possibly buy some of the cars which Haar Motor had won at the June 7 bidding. Dow agreed at this time to sell him two cars. Plaintiff further testified that at the time of this second conversation with Dow some discussion was had concerning another bidding scheduled for later in June. Plaintiff stated that he asked Dow if there was any possibility of bidding on these cars and that a direct reply to this inquiry was never received. He never heard anything further about the cars, which were, in fact, offered for sale in defendant's letter of June 19.

5. The fifth and last 1961 bidding was announced in defendant's letter of December 5. Plaintiff testified that he offered Haar Motor $75 instead of the previous $50 margin if Haar would submit bids for him at this December auction, and Haar Motor agreed to submit them. Upon learning that he won only two of the bids he requested to be submitted, plaintiff asked Dow if the successful bid prices on all the cars offered were available. Dow replied that they were not available. Plaintiff testified he first obtained the bid prices Dow had

said were unavailable from a Ford dealer in Springfied and then had another conversation with Dow in which he told Dow that the bid prices had not been submitted as agreed upon. In reply Dow shrugged his shoulders and said, "I put in the same bids. If they were changed, they must have been changed in the office."

Haar's change of position from one of cooperation in a mutually profitable relationship to one of equivocation and outright refusal to deal established, plaintiff maintains, Haar's participation in the conspiracy. That Haar purchased 54 factory Fords in 1960 and sold 50 of them to plaintiff, but purchased only 14 in 1961 (and sold 5 to plaintiff), and 10 in 1962 (and sold 6 to plaintiff), was the direct result, plaintiff concludes, of that participation.

Defendant, on the other hand, contends that even if the conduct challenged here was in violation of the antitrust laws, that conduct was in no way responsible for the decline in plaintiff's purchases of factory Fords. Defendant attributes the decline in Haar's purchases —and, hence, plaintiff's purchases—to certain changes in market conditions occurring after 1960 which had the effect of reducing the number of factory Fords potentially available to all bidders. These factors, alleged to be unconnected with any unlawful agreement or purpose, were:

1. A reduction in the total number of factory Fords offered for sale by defendant in 1961 and 1962 over the total number offered to dealers in previous years;

2. The entrance in 1961 of two large Ford dealers in Springfield into the competitive bidding for factory Fords, whose success in bidding naturally reduced the number of cars potentially available to plaintiff through its principal supplier, Haar Motor Company;

6. Defendant objected to the admission of this testimony on the ground that it was hearsay. The first sentence of challenged testimony, however, was admissible as showing verbal conduct indicating equivocation and refusal to sell. The second sentence was clearly hearsay. It was properly admitted, however, because there was sufficient evidence independent of the statement to establish a conspiracy and Harr Motor's participation in it.

3. Changes in 1961 and 1962 in the bidding procedure by which factory Fords were sold, which changes broadened the bidding and sharpened the competition.

The extent to which Haar Motor Company participated in the unlawful conspiracy and the impact any such participation might have had on plaintiff's purchases of factory Fords were questions for the jury to resolve. The evidence was in conflict as to the extent of the reduction in total number of factory Fords defendant offered for sale during the period in question.[7] The jury was not required to accept defendant's figures, nor was it required to believe defendant's evidence as to the effect of the alleged changes in bidding procedures or that any such changes were unconnected with the conspiracy.[8] Apparently the jury did not find defendant's explanation of plaintiff's fate compelling.

On appeal from a judgment following the verdict of the jury, our only concern is whether a finding that defendant's conduct damaged the plaintiff was clearly erroneous. We cannot say it was. A reasonable inference to be drawn from plaintiff's evidence regarding Haar's conduct is that sometime after defendant's initial letter Haar joined in the conspiracy. Even if the market factors to which defendant points did contribute to plaintiff's injury and were unconnected with the conspiracy, a plaintiff in an antitrust suit is not barred merely because factors other than defendant's unlawful conduct may have contributed to its injury. "The usual rule in tort is that a plaintiff may recover for loss to which defendant's wrongful conduct substantially contributed, notwithstanding other factors contributed also. Restatement, Torts § 431 (1934)." Momand v. Universal Film Exchanges, supra at 43; Haverhill Gazette Company v. Union Leader Corporation, 333 F.2d 798 (1st Cir. 1964). On the basis of this record the jury was justified in concluding that with reasonable probability there was a substantial causal connection between defendant's unlawful acts and the decline in plaintiff's purchases of factory Fords.

The final necessary element of plaintiff's case is proof of the amount of actual damages incurred. Once the fact of damage has been established, reasonable evidence from which the trier of fact might rationally infer the amount of that damage is all that is required. Bigelow v. RKO Radio Pictures, Inc., 327

7. Plaintiff introduced statistics which indicate a smaller decline in total factory Ford sales by defendant during the period in question than did defendant's statistics. Defendant's sales figures were compiled on a calendar year basis while those of the plaintiff were compiled on the basis of its fiscal year running from September 1 to August 31, and it is impossible from this record to reconcile the two compilations. For example, for the period about which most of the evidence was offered, defendant states that 136 factory Fords were sold in calendar year 1961, down from 210 in calendar year 1960; and plaintiff states that 150 factory Fords were sold in its fiscal year 1960–61, down from only 181 in fiscal 1959–60. During the period September 1, 1960, to December 31, 1961, which encompasses both plaintiff's fiscal year 1960–61 and defendant's calendar year 1961, defendant held auctions of factory Fords on six occasions, but figures for the number of cars sold at each auction are available in the record (from defendant's bid letters) for only four of the six occasions. It is impossible, therefore to check the accuracy of either set of figures offered, and the jury would be entitled to rely upon those of the plaintiff, which showed a more modest decline in total factory Fords sold during the period in question than did those of the defendant.

8. In addition to plaintiff's testimony regarding dealings with Harr Motor Company, the jury had before it plaintiff's testimony that a Mr. Catalani of Mutual Ford in Springfield refused to sell to him during the period in question because, "What little profit I make on it will mean nothing to me because Ford requested us not to sell them to dealers." Plaintiff further testified that Germano Ford of Easthampton, Massachusetts, refused to sell to him because, "Ford is really putting a little pressure on us, and I don't want to get in trouble over a few factory cars." This testimony was properly admitted over defendant's hearsay objection (see footnote 6, supra).

U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). To establish this amount plaintiff introduced evidence showing gross profit on factory Fords, gross profit on all sales, and net profit on all sales before and after the alleged conspiracy. Plaintiff was unable, however, to segregate net profit on factory Fords from total net profit on all sales. In addition plaintiff gave oral testimony, over defendant's objection, as to the estimated average gross profit ($300) and net profit ($250) on a single factory Ford. Defendant's objection to the admissibility of this evidence is that the "net" profit figure given for a single factory Ford was reached by taking the average gross on a single factory Ford and subtracting only the immediate, incidental costs of putting a single car in condition to sell—the cost of a few spare parts—without taking into account general overhead and operating costs. The accuracy of plaintiff's testimony, however, was a matter going to its weight, not its admissibility.

From this evidence the jury could reasonably have found the damages it did find once the question of causality is settled. The evidence showed net profits in 1959 and 1960 of approximately $129 and $6,421 respectively, a net loss of $4,817 in 1961, and a net profit of $1,385 in 1962. From this evidence the jury would be entitled to estimate the net profit plaintiff would have made during the period in question but for defend-

ant's conduct. While plaintiff was unable to show what percentage of its past net profit was attributable to factory Ford sales, the jury could reasonably use the percentage of past *gross* profit attributable to factory Fords, which plaintiff introduced, as a measure of future *net* profit which would have been attributable to factory Fords.[9] It seems relevant in this regard that factory Fords accounted for only about twenty-five percent of plaintiff's sales volume prior to the beginning of the alleged conspiracy, but accounted for approximately fifty percent of the gross profit during the same period.

The jury could have estimated damages in another way. It had before it evidence of the number of factory Fords purchased by plaintiff before and after the alleged conspiracy began. From this it could reasonably have estimated the number of factory Fords plaintiff would have been able to purchase but for defendant's conduct and multiplied this figure by an amount based on its estimate of the weight to be given to Webster's testimony that his average net profit on a single factory Ford was approximately $250.[10]

The degree to which evidence of lost profits will succeed in establishing the reasonable certainty of damage claimed will, naturally, depend in large measure upon the circumstances of the

9. For example, plaintiff's evidence shows that for the two years prior to the alleged conspiracy approximately fifty percent of its gross profit was attributable to sales of factory Fords. Its average yearly net earnings for the same two years showed a net profit of approximately $3275; its average yearly net earnings for the two years following the beginning of the alleged conspiracy showed a net loss of approximately $1700. Considering two year averages, the difference in before and after net earnings was, then, approximately $5000 a year. Considering only the one year immediately preceding and that immediately following the beginning of the alleged conspiracy, the difference in yearly net earnings was approximately $11,200. The jury verdicts of $5000 and $4000 fall somewhere be-

tween fifty percent (the percentage of gross profit attributable to factory Fords before the alleged conspiracy) of each of these two figures.

10. For example, plaintiff's evidence showed that for the two years prior to the alleged conspiracy it purchased an average of about 42 factory Fords a year, and for the two years following, about 11 a year. The difference between these two average figures, 31 cars a year, multiplied by plaintiff's net proft per car figure of $250, would give a figure of $7750. The jury verdicts of $5000 and $4000 could be seen to reflect a reasonable reduction of this figure on the basis of the weight given plaintiff's net profit estimate and defendant's evidence of other factors to which the decline in plaintiff's purchases of factory Fords could be attributed.

particular case. But past earnings are now generally recognized as an acceptable measure of future profits in antitrust cases. Bigelow v. RKO Radio Pictures, supra. Evidence of the kind plaintiff relies upon in this case was accepted by the Supreme Court in Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927).[11] Precise computation of damages can rarely be derived from the complexities of antitrust litigation. This court has recognized that older standards requiring "certainty" of damages have given way to "proof of losses which border on the speculative, in order to implement the policy of the antitrust laws." Momand v. Universal Film Exchanges, supra, 172 F.2d at 42. The jury's finding of actual damage in the amount of $4000 has a rational basis in this record.

The judgment will be affirmed.

11. In that case, plaintiff showed past gross profit on defendant's line of goods but was apparently unable to show what, if any, percentage of net profit on all lines handled was attributable specifically to defendant's products. Plaintiff also estimated the additional carrying charge that would have been incurred had defendant's products been available. The Supreme Court held that a jury verdict for the plaintiff could stand on this evidence, even though there had been no estimate of future profits. In addition the jury in Kodak did not have the advantage of plaintiff's prior net profit as a guide, as did the jury here, because prior to the conspiracy in Kodak plaintiff had suffered net losses while subsequent to the conspiracy plaintiff enjoyed its first net profit.