HOMEFINDER'S OF AMERICA, INC.
and Keith Walker, d/b/a
Homefinder's, Plaintiffs,

v.

PROVIDENCE JOURNAL COMPANY
et al., Defendants.

Civ. A. No. 5133.

United States District Court,
D. Rhode Island.

June 8, 1979.

Ralph J. Gonnella, Ralph J. Gonnella, Ltd., Providence, R. I., for plaintiffs.

Knight Edwards, Matthew F. Medeiros, and Joseph V. Cavanagh, Jr., Edwards & Angell, Providence, R. I., for defendants.

## OPINION AND ORDER

FRANCIS J. BOYLE, District Judge.

This is an action in which Plaintiff, Homefinder's of America, Inc., seeks damages and mandatory equitable relief against Defendant Providence Journal Company, its Director of Advertising, George Bellano, and so-called nominal Defendants John Doe and Jane Roe, described as customers of Plaintiff and Defendant Providence Journal Company whose present identities are unknown. Plaintiff's Complaint is based upon Sections 1 and 2 of the Sherman Anti-Trust Act of 1890, 15 U.S.C. §§ 1 and 2. The action was heard on a second Amended Complaint on its merits following denial of a preliminary injunction. *Walker v. Providence Journal Company,* 493 F.2d 82 (1st Cir. 1974).[1]

There is a total absence of evidence aimed at implicating the individual Defendants and in accord with Plaintiff's concession at oral argument as to the individual Defendants, judgment will enter in their favor for costs.

The basis of this action is the refusal of Defendant, Providence Journal Company, hereafter Defendant, to accept Plaintiff's advertising for publication in its newspapers concerning available rental housing vacancies, and the adoption by Defendant of a policy declining to accept any advertising for publication where a fee is required of prospective tenants in order to obtain rental information.

Plaintiff in substance contends a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by reason of the acquiescence of two firms, other than Plaintiff, who furnished rental information for a fee, in the policy of Defendant to refuse to publish advertisements, as a *per se* violation or a violation of the "rule of reason."[2] Additionally, Plaintiff alleges violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, claiming that Defendant monopolizes and, also, attempts to monopolize the renter information service market by means of its strategic dominance over the daily newspaper market in the relevant geographic area.

In addition to testimony presented at an extended hearing, the Court has also considered as evidence testimony submitted in

1. Plaintiff Keith Walker's action has been dismissed for failure to respond to discovery requests.

2. Plaintiff has additionally moved to amend the second Amended Complaint to add as co-conspirators two individuals, the Board of Real- tors, the customers of Plaintiff, the customers of Defendant, and real estate brokers who comply with Defendant's policy. Additionally, five Defendants were eliminated as Defendants by amendment.

connection with a hearing on Plaintiff's prayer for preliminary injunction on May 10 and 11, 1973 and portions of depositions designated by counsel. The Court makes the following findings of facts and conclusions of law:

Plaintiff is a Colorado corporation created in 1971. In 1976, its name was changed to Pacific-Atlantic Development Co., Inc. Initially, it operated a rental information service at Denver, Colorado. It collected information concerning available rental properties, listed the information and sold the information to prospective tenants for a fee. Landlords were permitted to list their properties without charge. Prospective tenants purchased a contract or policy from Plaintiff—valid for a year. The information collected by Plaintiff was then made available to the prospective tenant. Plaintiff later sold its operating business and has not itself directly participated in that business since that time. Rather, Plaintiff began the business of franchising its method of doing business. It succeeded in contracting with franchisees throughout the United States, in parts of Canada, and Australia. In general, Plaintiff provided its franchisees with instructions in its method of providing renter information and provided assistance in the actual operation of the franchise, including accounting services and advertising advice for a percentage of the franchisee's gross income.

On August 1, 1972, Plaintiff entered into a franchise agreement with one Keith Walker, who was then an employee of another franchisee, whereby Walker was granted an exclusive license to offer listings of available real estate limited to Providence and Kent Counties in the State of Rhode Island. The agreement was terminable by either party upon 30 days written notice and upon termination the franchisee was required to immediately transfer to Plaintiff all outstanding and current listings, customer records, documents, books of account and all other records relating to the operation of the franchise, and all mail. Upon termination, the franchisee was required to furnish services to customers for a period of one year. Upon the franchisee's

failure to continue to provide services for a period of one year, the Plaintiff was authorized to expend a reserve account of up to $20,000 to honor franchisee's commitments. The reserve account was created by a charge of 5% on gross sales until the reserve account, retained by Plaintiff, amounted to $20,000.

Plaintiff at the time of trial was not engaged in any rental information service anywhere. It now operates a check cashing service in Denver, Colorado. The reason assigned for its withdrawal from the rental information business was a Federal Trade Commission Consent Order which Plaintiff found difficult to supervise and which, it was testified, could have subjected Plaintiff and its officers to personal liability. *In the Matter of Rentex, Inc. T/A Homefinders of America, etc., et al.,* 87 F.T.C. 1340 (May 25, 1976).

Although Plaintiff now asserts that, if it is successful, it will revive its business at Providence, Rhode Island, this assertion is contrary to Plaintiff's explanation of the purpose of this litigation stated in its weekly newsletter to dealers published shortly after this litigation was commenced. It stated:

*THE LAWSUIT IN PROVIDENCE:*

The situation in Providence is as follows. First of all, our attorney, Mr. Tony Pennacchia, has suggested that since Mr. Walker has left we should not reopen the Providence office and that we should not service the accounts in the Providence area. I am sure this seems a great deviation from our normal policy; however, Mr. Pennacchia's reasoning is that there will be a certain amount of consumer protest due to the fact that no dealer is in Providence to service the local accounts. Our firm in the lawsuit and litigation against the Providence Journal will seize upon this situation to blame the newspapers for, in fact, our inability to service these accounts. In other words, we are alleging in our lawsuit that not only has the company suffered irreparable harm by the newspaper's actions and not only

has Mr. Walker suffered irreparable harm from the newspaper, i. e. he went out of business, but also the consumers in the Providence area who have contracted with us for our services are also individually and collectively suffering damages which will be laid to blame directly upon the action of the newspaper's refusing to run our advertising. We feel that by blaming the newspaper for this action this tends to strengthen our position that the newspaper is a monopoly and a defacto public utility who, can create great harm and damage upon not only a firm and its employees per se, but also a community at large. Consequently, at this time we will not replace the dealer in Providence and the Providence accounts will go unserviced. This should not cause great hearm (sic) to our reputation since, as you know, each of you will soon be changing to the use of Rentex and whereas it is contrary to our normal code of ethics of operation, I believe Mr. Pennacchia's point is well taken and this action could ultimately serve to benefit the company and possibly the consumer.

The Court cannot accept as fact Plaintiff's assertion that, if successful in this action, it will revive its renter information service in the Providence area. In addition to the fact that the F.T.C. order of May 25, 1976 will severely curtail Plaintiff's modus operandi, it appears that it is now engaged in only two businesses, check cashing and this litigation. Its representations concerning future operation are not credible.

Plaintiff seeks damages for Defendant's past refusal to accept its advertising and seeks to compel Defendant to accept its advertising in the future. Plaintiff cloaks its demands under the provisions of an Act of Congress adopted in 1890, which sought to prevent combinations or intentional action designed to eliminate or limit freedom of economic opportunity. This legislation recognized the need to insure conditions of free competition in a society constitutionally endowed with a considerable degree of opportunity of choice. It is Plaintiff's argument that while it may advertise as it chooses, Defendant lacks the choice of de-

clining to print that which Plaintiff wishes to publish. Plaintiff would have this Court ignore the probable effect of Defendant's publication of Plaintiff's advertisements. In mildest terms, the nature of Plaintiff's advertising is misleading. It sought to notify the public, not of the qualities and virtues of its service, but of the alleged availability of particular properties. At first blush, this seems to be inconsistent with Plaintiff's own interest, since the commodity which it had for sale was information concerning the availability of certain properties which would be disclosed only upon the payment to Plaintiff of its fee. In fact, the purpose of this advertising eminently served Plaintiff's purpose. It inserted advertisements which were calculated to attract an unusual degree of attention, indicating that properties were available for rent under circumstances that were, to say the least, unusual. For example, its advertisements stated that children and pets were welcome, utilities were paid and automobile parking was available. Complaints concerning this type of advertising establish without doubt that it is what has been called "bait" advertising. When the prospective tenant called the listed telephone number, it turned out to be Plaintiff's telephone and the exuberant prospective tenant was told that the property advertised was no longer available but if the prospective tenant would merely come to Homefinder's Office and pay the fee of $20, other listings would be made available. In some instances, it is admitted, properties were advertised by Plaintiff without the knowledge or consent of the owner, and in terms quite different from those which the owner had in mind.

Plaintiff in oral argument contends that the purpose of this type of advertising was to notify the public that it had listings of properties in particular areas. This explanation cannot be accepted. It is clear that Plaintiff's admittedly deliberate misrepresentation was solely for the purpose of entrapping desperate people seeking a place to live by enticing them as customers through false, unauthorized and misleading

advertisements. Contrary to Plaintiff's pious protestations of principles necessary to free competition, Plaintiff would require Defendant to become an unwilling co-conspirator to mislead the customers of Defendant Providence Journal Company.

■ Plaintiff first argues that Defendant Providence Journal Company violated § 1 of the Sherman Act, 15 U.S.C. § 1.

Section 1 provides in part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal  .   .   .

In order for Plaintiff to succeed on this theory, it must necessarily establish that the Defendant Journal either combined or conspired in restraint of trade within the meaning of the Act. The record indicates however, and this Court finds as a matter of law, that the Journal's action in rejecting Plaintiff's advertising and establishing its policy not to accept advertising from any rental referral firm who charged a fee to the prospective tenant does not violate § 1 of the Sherman Act.

■ The purpose and policy of the Act is to preserve competition by eliminating conduct whose purpose or effect was to restrain or obstruct the course of trade.

[I]n the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell.

*United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919).

■ The announcement of policy and simple refusal to deal, without more, is not barred by § 1. Section 1 bars concerted activity in the form of a combination or conspiracy to effectuate a policy in restraint of trade. Plaintiff alleges that the co-conspirators with Defendant Journal

were the two firms who like Plaintiff charged a fee to tenants, the Board of Realtors, real estate brokers who complied with Defendant's policy, as well as the customers of both Plaintiff and Defendant. In substance, Plaintiff argues that their acquiescence in Defendant's policy, be it voluntary or involuntary, satisfies the collaboration requirement of § 1. The Court holds that it does not.

■ The facts establish that Defendant's actions were unilateral and fall squarely within the *Colgate* doctrine, as limited by later Supreme Court decisions. See: *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Federal Trade Comm. v. Beech-Nut Packing Co.*, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1921). Defendant instituted a new policy and communicated it clearly to its readers and customers by means of a printed announcement in its advertising section. It then proceeded to adhere to its new policy as announced, but it employed no coercive or threatening means or other affirmative action prohibited by § 1 in order to secure compliance with its policy. The Court does not accept Plaintiff's argument that Defendant, by inviting readers to call if they were charged a fee, was utilizing a reporting system which constituted prohibited affirmative action. This Court must determine whether an unlawful combination is proved by judging what the parties actually did, rather than by the words they used. *United States v. Parke, Davis & Co.*, 362 U.S. at 44, 80 S.Ct. 503. Defendant Journal's conduct does not resemble the elaborate enforcement schemes which the Supreme Court found to be illegal combinations in both *Albrecht* and *Parke, Davis.*

■ Furthermore, "[i]t is not sufficient to merely allege acquiescence and thus claim a combination has been demonstrated." *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256 (5th Cir. 1978) at 289. The Court must scrutinize the totality of circumstances which induced the alleged acquiescence after a simple policy an-

nouncement. Where the customer acquiescence was "based solely on the individual self-interest of the customer in continued dealings" with the Defendant, such acquiescence is not an agreement within the reach of the Sherman Act.

This is true even though it is recognized that there is no difference in economic effect between adherence to a manufacturer's policy effected by prohibited agreement and adherence effected by conduct within the narrow safety zone offered by *Colgate.* *Ford Motor Company v. Webster's Auto Sales, Inc.,* 361 F.2d 874, 879 (1st Cir. 1966); *United States v. Parke, Davis & Co.,* 362 U.S. at 44, 80 S.Ct. 503. Plaintiff fails to establish the element of joint action and thus fails to sustain its § 1 claim.

■ If Defendant Journal's conduct were viewed as satisfying the § 1 combination conspiracy requirement, which this Court expressly finds unsatisfied, Plaintiff fails to prove that the alleged combination does in fact unreasonably restrain trade. *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). Plaintiff's argument that Defendant's conduct should be regarded as illegal *per se* is without merit. The application of the *per se* rule which does not take into account the market power of the parties, the purpose of the restraint, or the legitimate business reasons for the practice, is limited to those practices which have a "pernicious effect on competition" which lack "any redeeming virtue." *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

■ Applying the more flexible Rule of Reason recently embraced anew by the Supreme Court in *Continental T.V., Inc. v. G.T.E. Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), a wide variety of factors are to be considered in order to determine legality. The inquiry must focus on a consideration of the impact on competitive conditions. *Standard Oil v. United States, supra,* 221 U.S. at 65, 31 S.Ct. 502.

There is a total lack of evidence which remotely suggests the slightest impact on competitive conditions. The Plaintiff's contention that Defendant Journal's classified advertising is the only method of communicating with prospective tenants is patently absurd if what Plaintiff has in mind is attracting customers by so-called "tombstone advertising"; that is, advertising which proclaims the alleged virtues of Plaintiff's service as opposed to advertising which relates to particular properties. Plaintiff ignores not only other methods of communication, radio, television, billboard, weekly newspapers, so-called shoppers' guides and throw aways, but has avoided totally any references to other sources of renter information such as real estate agents and indeed "For Rent" signs perched in vacant tenement windows.

Plaintiff's argument starts with the conclusion that classified advertising concerning the availability of potential rental properties is imperative to Plaintiff's success and then argues that in view of the extensive circulation of Defendant Journal's classified advertising, it must be considered to be a monopoly. This intellectual "bootstrapping" would enlarge the scope of Section 1 to the point where no businessman could refuse to deal.

Under the Rule of Reason analysis, the purpose of the arrangement is a serious consideration.

The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Chicago Bd. of Trade v. United States, supra,* 246 U.S. at 238, 38 S.Ct. at 244.

■ The evidence in the record clearly shows and this Court finds that the Defendant's decision to reject Plaintiff's advertising and to institute its policy not to accept ads from fee-charging firms was not in any

way intended to restrain trade or enhance Defendant's own position in the rental information market. Indeed, there is no evidence that Defendant's policy did anything other than reduce its advertising revenues. Rather, it was sound business judgment made at a financial sacrifice, intended to maintain a quality advertising section for its readers. After receiving complaints from readers as to the quality of service Homefinder's was providing, and recognizing the obvious potential for abuse in other such firms, Defendant made a legitimate consumer-oriented decision to stop dealing with fee-charging firms.

■ In substance, Defendant was primarily motivated by its legitimate concern that the ads it was publishing were injurious to the public in that they constituted a form of deceptive advertising. In view of the fact that unfair or deceptive acts or practices in commerce are unlawful under 15 U.S.C. § 45, it was certainly good business and ethical judgment for Defendant, believing Homefinder's ads to be deceptive, to discontinue its dealing with it. Plaintiff here is alleging serious anti-trust violations, yet the very foundation upon which those alleged violations rest was Defendant's refusal to participate in a potentially unlawful operation.[3] 15 U.S.C. § 45, although found in a different chapter than 15 U.S.C. § 1 and § 2, was designed to supplement and bolster the Sherman Act. Its very purpose was to eliminate unfair competition and practice which if left untouched would inevitably become the evils prohibited by the Sherman Act. *F. T. C. v. Motion Picture Adv. Co.,* 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426 (1953); *Fed. Trade Comm. v. Raladam Co.,* 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324 (1931); *Butterick Pub. Co. v. Federal Trade Commission,* 85 F.2d 522 (2nd Cir. 1936).

Section 2 of the Sherman Act, 15 U.S.C. § 2, compliments the prohibition of combinations to monopolize forbidden by § 1 of the Sherman Act. Its thrust includes the prevention of unilateral action to attempt to obtain monopoly power or the actual acquisition of monopoly power. It is essential to this aspect that a determination is made concerning what product and what market is at issue.[4]

In *Walker v. Providence Journal Company, supra,* the Court of Appeals stated that plaintiff had not demonstrated on the record, at that time, such a likelihood of success on the merits of its Section 2 claim that would have required the issuance of a preliminary injunction. In its opinion the Court of Appeals, in part, stated:

> This market presumably refers to the market for information about housing vacancies; we say presumably because plaintiffs have made no attempt to define the market, and have made no proof that the Journal has anything approaching a monopoly in it. Such careful definitions and proof are indispensible in antitrust actions.

*Walker v. Providence Journal Company, supra,* at 87. After a plenary trial, the circumstances remain the same.

Plaintiff's evidence is directed solely to the market for classified advertising in newspapers of individual properties for rent. In its effort to establish the product, Plaintiff has established that it supplies information to its customers concerning particular available rental properties. This is a service and is similar to the service which the Defendant provides to its readers in the classified section of its newspapers. As a consumer may obtain the information in the possession of Defendant concerning vacancies by purchasing its newspapers, a con-

---

**3.** Plaintiff's suggestion that Defendant can edit untruthful copy or refer complaints to the proper regulatory authority, including the Federal Trade Commission, seeks to shift a burden to Defendant without justification.

**4.** Plaintiff's Pre-Trial Memorandum, P. 57, note 52 contends that this is an instance of use of monopoly power and therefore "a product and

geographic market definition is not needed for the market upon which the restraint is being imposed," citing *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 224, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) note 59. Nothing in note 59 supports this contention or even remotely suggests it.

sumer can obtain the information in the possession of Plaintiff by paying it a fee.

In spite of the observation of the Court of Appeals in this action that relevant market must be carefully defined and proof is indispensable, it is far from crystal clear exactly what the Plaintiff contends. Perhaps the best statement of its most recent contention is found in its proposed findings of fact, as follows:

28. The relevant geographic market for purposes of Plaintiff's Section II (sic) claim, is the Providence—Pawtucket—Warwick, Standard Metropolitan Statistical Area (P.P.W.—S.M.S.A.) A relevant geographic sub market is the Providence City Zone as designated by the Audit Bureau Circulation Reports.

29. The relevant product market for purposes of plaintiff's Section II (sic) claims are:

a) Daily newspaper readership.

b) Daily newspaper advertising.

These markets are interdependent and comprise the daily newspaper market.

30. Daily newspapers are a distinct and separate product market from all other forms of advertising media.

Plaintiff contends that because of Defendant's policy, it is denied access to the relevant daily newspaper advertising market, and that Defendant possesses this power of elimination due to its ". . . 'strategic dominance' over the daily newspaper market and that it possesses monopoly power in the daily newspaper market in the relevant geographic areas." (Reply Memorandum of Plaintiff, Page 6).

Plaintiff contends both a vertical and a horizontal effect of the Defendant's policy, i. e. horizontal in the sense that the effect of the policy is to preserve the Defendant's position as a distributor of rental information from competition, and vertical in the sense that all rental referral firms are eliminated from the marketplace.

Plaintiff argues three theories "of monopolization":

(1) Unlawful use of monopoly power in readership to foreclose competition in the marketplace;

(2) Bottleneck analysis; and,

(3) Unlawful use of monopoly power in advertising to foreclose competition in the marketplace.

Plaintiff argues as its first theory that Defendant has used its monopoly power in readership to foreclose competition in the marketplace, citing *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *United States v. Griffith*, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); and *Gamco Inc. v. Providence Fruit & Produce Building*, 194 F.2d 484 (1st Cir. 1952).

Plaintiff argues as its second theory that the denial of access to a "scarce facility" necessary for competition is a violation of Section 2 as the creation of a bottleneck impeding the free flow of commerce.

The third string to Plaintiff's argumentative bow is the contention that Defendant's use of monopoly power in advertising denies competitors a marketplace.

Additionally, Plaintiff argues an "attempt to monopolize" by eliminating all rental referral firms from competition with Defendant's marketing system.

Lastly, Plaintiff argues that the only justification defense available to Defendant is that "physical limitations" compel Defendant to choose between competitors.

The breadth and sweep of Plaintiff's arguments have a tendency to produce a breathless state of mind which requires a step backward to place this controversy in manageable perspective. Put in less complex and more easily understood terms, the Plaintiff argues that Defendant has a duty to publish Plaintiff's advertisements, irrespective of content, in order that Plaintiff may operate its business at the least expense and with the greatest possible gain. Otherwise Defendant is guilty of what Plaintiff calls "monopoly action."

Plaintiff does not argue "that the Defendant Providence Journal Company unlawfully acquired monopoly power in the daily newspaper market. On the contrary, the more likely conclusion is that the De-

fendant is 'a natural monopoly in the relevant market.'"

The test of violation of Section 2 of the Sherman Act is two-fold: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). *See also: Kansas City Star Company v. United States*, 240 F.2d 643, 660 (8th Cir. 1957); *Union Leader Corp. v. Newspapers of New England, Inc.*, 284 F.2d 582 (1st Cir. 1960); *Cole v. Hughes Tool Company*, 215 F.2d 924 (10th Cir. 1954). Twenty-five years ago, the Supreme Court pointed out that at that time only eight percent of daily newspaper cities enjoyed the clash of opinion which competition among publishers of the daily press could provide and that ". . . daily newspaper competition within individual cities has grown nearly extinct." *Times-Picayune v. United States*, 345 U.S. 594, 603, 73 S.Ct. 872, 877, 878, 97 L.Ed. 1277 (1953).

It is the nature of the business that the dominant cause of newspaper monopoly is "efficiencies of large circulation size." *Monopoly in the Daily Newspaper Industry*, 61 Yale L.J. 948, 1005 (1952). Further, the local reader who has an interest in local events will not have that interest satisfied by an out-of-town newspaper. The circulation statistics introduced by Plaintiff fully support these observations.

In those communities, Pawtucket—Central Falls, and Woonsocket, Rhode Island, and Attleboro, Massachusetts, communities located in the Providence—Pawtucket—Warwick S.M.S.A., and in which local daily newspapers are published, the Defendant is at a competitive disadvantage. This is also true with respect to some communities adjacent to Pawtucket—Central Falls, Woonsocket and Attleboro, e. g. Lincoln, Burrillville, Cumberland, North Smithfield, Rhode Island, and North Attleboro, Norton, Plainville, Blackstone and Millville, Massachu-

setts. The circulation advantage of the Defendant has the appearance of what one of Plaintiff's witnesses characterized, in another context, as a "swiss cheese" effect. In all of the other communities located in the Providence—Pawtucket—Warwick, S.M.S.A., Defendant has a circulation advantage with an advantage of 152,379 to 5846 in the Providence City Zone so-called, consisting of the communities of Providence, Cranston, East Providence, North Providence, Johnston, Barrington, Bristol, Warren, Warwick, West Warwick and East Greenwich, Rhode Island. Furthermore, by limiting the geographic area to the Providence—Pawtucket—Warwick S.M.S.A., or as a submarket, the Providence City Zone, so-called, the Plaintiff has eliminated the competitive effect of the two daily newspapers published in the southern part of the State of Rhode Island, in the communities of Newport and Westerly. This omission is significant in that although editions of Defendant's newspaper are specially published for those areas, and the Defendant's daily newspapers are sold there, it is at a distinct competitive disadvantage. The same observations can be made concerning the Fall River, Massachusetts area.

It is only in the so-called Providence City Zone that it can be said that Defendant has "strategic dominance" of the daily newspaper market. This is a geographic area with the City of Providence at its center and adjacent communities in a rough semi-circle extending from East Providence on the east, southerly along both sides of Narragansett Bay and westerly and northerly to North Providence, all within the State of Rhode Island, and constituting only a portion of the Providence—Pawtucket—Warwick S.M.S.A. However, there is no evidence to support in any fashion the contention that this area is an existing submarket for renter information.

Furthermore, there is no evidence that Defendant maintains monopoly power. There is no evidence to establish the basic premise of Plaintiff's contention upon this branch of the argument, i. e., that Plaintiff controls the renter information market. As

previously stated, other methods of obtaining information concerning rentals were ignored by Plaintiff, but this Court may not be so oblivious to the economic facts of life. It is a fact that Defendant sells more newspapers than other newspapers published in certain areas of the State of Rhode Island. This fact is a considerable step away from the bald unsupported conclusion asserted by Plaintiff that, therefore, it possesses monopoly power with respect to renter information.

Plaintiff's Complaint is denied and dismissed. Judgment will enter for Defendant Providence Journal Company for costs.

SO ORDERED.