HOME PLACEMENT SERVICE, INC.,
et al., Plaintiffs, Appellants,

v.

The PROVIDENCE JOURNAL
COMPANY, Defendant,
Appellee.

HOME PLACEMENT SERVICE, INC.,
et al., Plaintiffs, Appellees,

v.

The PROVIDENCE JOURNAL
COMPANY, Defendant,
Appellant.

Nos. 86–1881, 86–1959.

United States Court of Appeals,
First Circuit.

Argued March 5, 1987.

Decided June 1, 1987.

Ralph J. Gonnella with whom Lynette Labinger, Providence, R.I., was on brief, for Home Placement Service, Inc.

Joseph V. Cavanagh, Jr. with whom Knight Edwards and Patricia A.S. Zesk, Providence, R.I., were on brief, for The Providence Journal Co.

Before CAMPBELL, Chief Judge, COFFIN and TORRUELLA, Circuit Judges.

COFFIN, Circuit Judge.

This aged and oft-detoured antitrust case originated in the District of Rhode Island and, in the course of its existence, has led to the disqualification or recusal of all federal judges sitting in that district. Appellants Home Placement Service, Inc. and Joseph P. Muschiano, Jr. (collectively referred to as "Home Placement") initiated this litigation in 1977, alleging that appellee Providence Journal Company (the "Journal") had violated sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, 2, by adopting a policy in 1973 of refusing to accept rental information advertising in its classified columns. The case is now before us for the third time in the last five years, having at one point or another captured the attention of each active member of this court. The tortuous procedural route travelled by this case is well documented in the two previous published opinions of this court and the intervening district court decision. *See* 739 F.2d 671 (1st Cir.1984), *cert. denied,* 469 U.S. 1191, 105 S.Ct. 964, 83 L.Ed.2d 969 (1985) (*"Home Placement II "*); 682 F.2d 274 (1st Cir.1982), *cert. denied,* 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983) (*"Home Placement I "*); 573 F.Supp. 1423 (D.R.I.1983).

In the current appeal, Home Placement seeks review of a district court determination that its proffered evidence of antitrust damages is legally insufficient and that its motion for a new trial on damages is without merit. It argues that the damage evidence in the record is sufficient to justify an award and, alternatively, that Federal Rule of Civil Procedure 63 and "constitutional considerations" mandate a new trial on the issue of damages in this case. It also argues that the district court's decision to award only nominal damages in this case does not comport with Federal Rule of Civil Procedure 52. In addition, both parties appeal the district court's award of attorney's fees in the amount of $74,055.16 to Home Placement.

## I. *Rule 63 and the Propriety of a New Trial.*

Home Placement first argues that the district court erred in denying its renewed motion for a new trial on the issue of damages. Because it is impossible to evaluate or even understand this contention without some reference to portions of the case's procedural history, we briefly recount the background facts relevant to the new trial motion.

### A. *Procedural Background.*

Home Placement's antitrust claims against the Journal arose from the same nucleus of facts that formed the basis of a similar suit by a previous plaintiff, Homefinders of America. *See Homefinders of America, Inc. v. Providence Journal Co.,* 471 F.Supp. 416 (D.R.I.1979), *aff'd,* 621 F.2d 441 (1st Cir.1980) (*"Homefinders "*). Like Home Placement, Homefinders had also been denied advertising space in the Journal's classified pages. Judge Boyle, sitting without a jury, heard evidence in the *Homefinders* case for eleven days, eventually finding against Homefinders on the issue of liability.[1]

Because Judge Boyle had acted as trier of fact throughout the *Homefinders* trial, and because much of Home Placement's case involved the same witnesses and ex-

---

1. We upheld the verdict on appeal, finding that the deceptive quality of Homefinders' advertising justified the Journal's actions and barred Homefinders from invoking the protection of the antitrust laws. *Homefinders of America, Inc. v. Providence Journal Co.,* 621 F.2d 441 (1st Cir.1980).

hibits as the *Homefinders* case, the parties to the instant case entered the following stipulation:

> The parties in the above-captioned matter hereby agree that the plaintiffs' claim for trial by jury is waived and that the case will proceed for trial before Judge Boyle, sitting without a jury. The parties further agree that the full record in the case of *Homefinders of America, Inc. v. Providence Journal Company*, et al (C.A. No. 5133) will be included as part of the record in the above-captioned matter, subject to objections to the admissability [sic] of evidence already in the record.

Home Placement describes the stipulation as a procedural device that permitted Judge Boyle to utilize the earlier *Homefinders* record as "trial testimony" and evidence, rather than having to hear the same witnesses for a second time.

The evidence for the *Home Placement* case consisted only of the stipulated record from the previous trial and the additional live testimony of Home Placement's president, Muschiano. As in the *Homefinders* case, Judge Boyle ruled against Home Placement on the issue of liability. On appeal, however, we reversed this decision [2] and remanded the case for a determination of damages, injunctive relief, and attorney's fees. *Home Placement I*, 682 F.2d at 281. We also suggested that the matter be assigned to a new trier of fact on remand. *Id.* In a subsequent order we clarified that our opinion did not amount to a requirement that the district court hold a new trial on the issue of appropriate relief. *See Home Placement II*, 739 F.2d at 673.

Judge Selya, who was assigned the case on remand, determined that a new trial was unnecessary. Instead, he reviewed the existing record and issued an opinion granting injunctive relief and awarding attorney's fees, but concluding that there was insufficient evidence for an award of more than nominal damages. *See* 573 F.Supp. at 1423. On appeal of the damage and attorney's fee rulings, we held that the case had to be remanded again because, for reasons no longer relevant, Judge Selya should have recused himself pursuant to 28 U.S.C. § 455(a). *Id.* at 677. In addition, we reconsidered our earlier clarification order in the face of Home Placement's argument, raised for the first time, that Rule 63 required a new trial on the issue of damages in this case.[3] On this issue, we reaffirmed that Home Placement was not entitled to a new trial for three basic reasons: (1) the earlier order constituted the "law of the case;" (2) the stipulation of the parties precluded the operation of Fed.R.Civ.P. 63; and (3) Rule 63, even if applicable, is discretionary and failure to grant a new trial in these circumstances would not amount to an abuse of discretion. *Id.* at 677–78.

On remand for the second time, the case was assigned to Judge Pettine, who voluntarily recused himself from the case. The case then travelled to the District of New Hampshire where it became the responsibility of Judge Loughlin. At this point, Home Placement renewed its motion for a new trial, citing our recent decision in *Townsend v. Gray Bus Lines Co.*, 767 F.2d 11 (1st Cir.1985), that Rule 63's "negative inference" mandates a new trial whenever a judge becomes disabled prior to filing findings of fact and conclusions of law. Judge Loughlin denied the motion, however, and Home Placement now appeals, arguing that the *Townsend* case worked a substantial change in this court's interpretation of Rule 63 and that, under this new interpre-

---

**2.** Unlike in *Homefinders,* 621 F.2d at 441, there was no finding in the *Home Placement* case that the plaintiff had engaged in deceptive business practices.

**3.** Rule 63 of the Federal Rules of Civil Procedure provides:

> If by reason of death, sickness, or other disability, a judge before whom an action has been tried is unable to perform the duties to be performed under these rules after a verdict is returned or findings of fact and conclusions of law are filed, then any other judge regularly sitting in or assigned to the court in which the action was tried may perform those duties; but if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial.

Fed.R.Civ.P. 63.

tation, we had no choice but to order a new trial when we reversed Judge Boyle's original decision, found the Journal liable for a violation of the antitrust laws, and remanded the case to another trier for a determination of the appropriate relief.

### B. *Rule 63 and Its "Negative Inference".*

Under Rule 63, if a judge becomes disabled *after* filing his or her findings of fact and conclusions of law in a civil case being tried without a jury, a successor judge may substitute for the original judge and complete any duties remaining in the case without holding a new trial. Nevertheless, the rule does empower the successor judge to grant a new trial if the remaining duties cannot otherwise be satisfactorily performed. Under the rule, the decision as to whether to hold a new trial is left entirely to the discretion of the successor judge. *See* Fed.R.Civ.P. 63.

As we have recognized, however, Rule 63 does not explicitly address the situation in which a judge becomes disabled *prior* to filing factual findings and legal conclusions. *Townsend v. Gray Line Bus Co.,* 767 F.2d 11, 17 (1st Cir.1985). In *Townsend,* therefore, we joined numerous other courts of appeal in recognizing that if a presiding judge in a civil case becomes disabled prior to issuing findings of fact and conclusions of law, then a successor judge must ordinarily retry the case unless the parties stipulate otherwise. *Id.* (citing *Whalen v. Ford Motor Credit Co.,* 684 F.2d 272 (4th Cir.1982) (en banc); *Thompson v. Sawyer,* 678 F.2d 257 (D.C.Cir.1982); *Arrow-Hart, Inc. v. Philip Carey Co.,* 552 F.2d 711 (6th Cir.1977)). This result, we reasoned, flows from the "negative inference" of Rule 63:[4] because the plain language of Rule 63 permits a successor judge to exercise discretion in granting a new trial only when the presiding judge becomes disabled *"after* a verdict is returned or findings of fact and conclusions of law are filed,"* Fed.R.Civ.P. 63 (emphasis supplied), the implication must be that a new

trial is ordinarily the norm when a successor judge takes a case *prior* to the filing of factual findings and legal conclusions. *Townsend,* 767 F.2d at 17.

Furthermore, the history of Rule 63 before the Advisory Committee on the Federal Rules of Civil Procedure, described by the Fourth Circuit in *Whalen,* 684 F.2d at 275–78, also supports the conclusion we reached in *Townsend.* At a meeting held in May, 1953, the Committee acknowledged that, unless the parties stipulated otherwise, Rule 63 required a case yet to be decided and interrupted by the disability of the trial judge to begin anew before a successor judge. *Whalen,* 684 F.2d at 276 (comments of chairman Mitchell). Logic requires this interpretation because Rule 63 is the only authority in the Federal Rules of Civil Procedure permitting a judge to substitute for a disabled colleague and continue an ongoing civil trial. *But cf. Fed.R.Crim.P.* 25(a) (Under the amended version of Rule 25, a successor judge may proceed with an ongoing criminal jury trial commenced before another judge upon "certifying that he has familiarized himself with the record of the trial."). Therefore, the rules endorse substitution without a new trial *only* once a case has reached the point at which findings and conclusions are filed and *only* if the successor judge, in the exercise of sound discretion, determines that a new trial is not essential to the completion of any remaining judicial tasks. Cases such as *Townsend,* which have yet to attain the appropriate stage of progress stated in the rule, must normally start from scratch before the successor judge.

### C. *Propriety of a New Trial.*

The issue before us in the instant appeal is whether either Rule 63 or its "negative inference" require a new trial in the circumstances of this case. As noted above, when the parties were last before this court, we considered a previous denial of Home Placement's new trial motion and held (1) that our earlier clarification order,

---

**4.** In *Townsend,* we also found that "constitutional considerations" of fairness embodied in the Due Process Clause of the Fifth Amendment will ordinarily require a new trial. *Townsend,* 767 F.2d at 18.

which left the determination of whether to grant a new trial to the sound discretion of the district court, had become the law of the case; (2) that Rule 63 did not apply in light of the parties' stipulation, *see supra* p. 4; and (3) that even if Rule 63 were to apply, "under the unique circumstances of this case, there would be no abuse of discretion in not granting a new trial on damages." *Home Placement II*, 739 F.2d at 677–78.

Of the three grounds supporting our original holding that a new trial on damages is unnecessary, the most difficult hurdle for Home Placement to overcome is our ruling that the earlier clarification order had become the "law of the case." *See id.* at 677. As Home Placement concedes in its brief, it is enormously difficult for a litigant to convince a court to take yet another look at an issue that has already been decided on two prior occasions. Home Placement argues, however, that a widely recognized exception to the "law of the case" doctrine should apply in this instance. Here, according to Home Placement, there has been a substantial change in the law subsequent to the first decision and, therefore, the original holding should not be considered the law of the case. *See, e.g., Page v. St. Louis Southwestern Railway Co.*, 349 F.2d 820, 821 (5th Cir.1965).

■ Home Placement would have us rule that we are not bound by the "law of the case" doctrine because, in the wake of *Townsend*, this circuit's interpretation of Rule 63 has fundamentally changed. According to this argument, Rule 63 is no longer discretionary, as we stated in *Home Placement II*, but rather mandates a new trial whenever it is applicable. This contention, however, is fundamentally flawed because *Townsend* had no substantive effect on our interpretation of Rule 63 proper. Rather, it merely recognized the negative inference that can be drawn from the rule for those cases in which a trial judge becomes disabled prior to rendering a decision. Nothing in *Townsend* departed from our earlier interpretation of Rule 63 and the rule, where it expressly applies, continues to provide that a determination of whether to grant a new trial must be left to the discretion of the trial court. We conclude, therefore, contrary to Home Placement's contention, that *Townsend* did not mark a substantial change in the law regarding this circuit's interpretation of Rule 63 and, accordingly, that there is no reason for us to disturb the twice issued new trial ruling that long ago became, and continues to be, the law of the case.

■ Were this not enough, we stand by our earlier decision that the parties' stipulation nullifies the operation of Rule 63, *see Home Placement II*, 739 F.2d at 677–78, and we reaffirm our conclusion that, even if Rule 63 applies here, the district court did not abuse its discretion by refusing to order a new trial given the facts of this case. *Id.* at 678. Nor do we accept Home Placement's novel argument that the instant case is directly governed by our "negative inference" language in *Townsend* simply because Judge Boyle never reached the question of damages and, hence, never entered findings of fact or conclusions of law on that particular point. This case does not fall within the narrow "mandatory new trial" category delineated in *Townsend* because, unlike the original judge in the *Townsend* case, Judge Boyle did file findings of fact and conclusions of law that disposed of the case before he became "disabled" by our ruling on appeal. The issue of the course to be followed by his successor arose only because we reversed his finding of no liability under the antitrust laws and exercised our inherent power to suggest assignment to another factfinder on remand for independent review of the largely stipulated damage evidence. *See Home Placement I*, 682 F.2d at 281. As we stated at that time, "it would be easier all around ... to have the further proceedings before another trier." *Id.*

We have found nothing to suggest that this procedure was improper given the circumstances of this case. Indeed, other courts of appeal have sanctioned this procedure in cases similar to our own by remanding to a different district judge for findings on an existing record without mandating a new trial. *See, e.g., Golf City,*

*Inc. v. Wilson Sporting Goods Co.*, 555 F.2d 426 (5th Cir.1977); *Group Association Plans, Inc. v. Colquhoun*, 466 F.2d 469, 471–72 (D.C.Cir.1972). Furthermore, we believe that our order was justified because the motivation underlying our action, at least in part, was to accord Home Placement the benefit of a fresh, impartial review of the damage evidence without subjecting it to a lengthy and costly court proceeding. We cannot imagine that a court of appeals wishing to remand a case for a determination of damages must always order a new trial before a successor judge whenever the original judge, for whatever reason, is no longer available to hear the case. Such a requirement would be especially repugnant when a retrial would be extremely time consuming, when the credibility of witnesses' testimony is not central to the determination to be made on remand, and when an independent and impartial review of the largely stipulated evidence contained in a written record would suffice.[5]

Upon reversing a determination of liability adverse to the plaintiff, an appellate court must be free to balance the costs and benefits of remanding the case to the same judge who initially erred in ruling against the deserving plaintiff, but who at the same time is obviously the person most familiar with the facts relevant to a calculation of damages. *Cf. O'Shea v. United States*, 491 F.2d 774, 779 (1st Cir.1974) (explaining the range of considerations influencing a decision to remand to a different judge for criminal sentencing). If, in such a case, the appellate court believes that the balance tips in favor of remanding the case to a different judge for whatever reason, and if the litigants would not be prejudiced by a determination on the existing record,[6] then a new trial is not required and the appellate court may leave the decision as to whether to grant a new trial to the sound discretion of the district court. Nothing in the language of Rule 63 prohibits an appellate court from proceeding in this manner and, further, the rationale animating our decision in *Townsend* does not require a new trial in this situation because the case has progressed past the point of decision by the original trial judge.

D.  *Summary.*

For the reasons explained above, we hold once again that our original clarification order stating that a new trial on damages was not mandatory, *see* 739 F.2d at 673, is the law of the case and continues to govern the resolution of this issue. Moreover, we are not persuaded that the purported "change" in the law identified by Home Placement is sufficient to nullify the operation of the law of the case doctrine in this instance. Neither Rule 63, nor the rule's "negative inference" as described in *Townsend*, mandates a new trial under the circumstances of this case and the district court properly exercised discretion in refusing Home Placement's request for a new trial before rendering its decision on the sufficiency of the damage evidence.

**5.** We find no merit in Home Placement's argument that it is patently unfair to permit any judge except Judge Boyle to reach a decision based on the *Homefinders* transcript. Even though Judge Boyle originally heard all the witnesses "live" at the *Homefinders* trial in 1978, the *Home Placement* trial was held over two and a half years later, beyond the time in which any busy judge can be expected to have a clear recollection of the live testimony. Judge Boyle, like the judges who have subsequently ruled in reliance on the stipulated record in this case, had to depend upon his analysis of the recorded testimony, not his memory of the original trial. He admitted as much when he reluctantly accepted the parties' stipulation at the beginning of the *Home Placement* trial, cautioning the parties that "if you intend that I rely on particular portions of that record, I do not intend to go back and read the whole record of the trial. If you intend that I look at particular sections of that transcript or particular exhibits, I expect you're going to give me a schedule of them, that will not provide a task fit for Hercules." Appendix at 278.

**6.** Undue prejudice to the litigants might exist if, for instance, the determination to be made by the new district judge turned substantially on the credibility of witnesses whom the judge did not have the opportunity to observe in the context of the original trial. The instant case, however, turns not on witness credibility, but on the legal sufficiency of largely uncontradicted damage evidence proffered by the plaintiffs through the testimony of expert witnesses.

## II. *Sufficiency of the Damage Evidence.*

In addition to its claim for a new trial, Home Placement contends alternatively that the district court erred in holding that its evidence of antitrust damages was insufficient to support an award of more than nominal damages. When we last remanded the case, we hoped to receive the benefit of "[t]he considered judgment of a trial judge in analyzing the [sufficiency of the damage] evidence," *Home Placement II*, 739 F.2d at 679, but the district court opinion we have received provides little enlightenment. It states only that "plaintiff has not by a fair degree of certainty proved damages" and then, citing *The Morning Pioneer, Inc. v. The Bismarck Tribune Co.*, 493 F.2d 383, 388 (8th Cir.1974), remarks that "[t]o award more than nominal damages in this case, the court would have to engage in speculation and conjecture." Home Placement rightly protests that such a finding does not satisfy Rule 52, which requires the court to "find the facts specially and state separately its conclusions of law," Fed.R.Civ.P. 52, and urges us either to find the damage evidence to be sufficient as a matter of law, or at the very least, to remand with instructions to provide explicit findings of fact and conclusions of law.

Given the lack of assistance offered by the district court and our desire to avoid yet another round of litigation on this matter, we have engaged in our own independent review of the antitrust damage evidence contained in the record. In this endeavor, we have been careful to view all the available evidence in the light most favorable to the plaintiff. We have also been mindful of the axiom, originally set forth in *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264–65, 66 S.Ct. 574, 579–80, 90 L.Ed. 652 (1946), and *Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 561–62, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931), that a private antitrust litigant .is not required to prove the amount of its damages with mathematical certainty. *See Wallace Motor Sales, Inc. v. American Motors Sales Corp.*, 780 F.2d 1049, 1062 (1st Cir.1985); *Jay Edwards, Inc. v. New England Toyota Distributor*, 708 F.2d 814, 821 (1st Cir.), *cert. denied*, 464 U.S. 894, 104 S.Ct. 241, 78 L.Ed.2d 231 (1983); *Farmington Dowel Products Co. v. Forster Manufacturing Co.*, 421 F.2d 61, 81 (1st Cir.1970). Nevertheless, we recognize that this guiding principle does not shift the burden of proof and that it is proper to indulge private antitrust plaintiffs only to the extent that there is evidence on the record from which a trier of fact could make a "just and reasonable inference" regarding the amount of damages. *Wallace Motor Sales*, 780 F.2d at 1062 (quoting *Bigelow*, 327 U.S. at 251, 66 S.Ct. at 574). If the plaintiff's proffered evidence permits no more than "pure speculation and guesswork," then the damage evidence is insufficient as a matter of law. *Id.; Farmington Dowel*, 421 F.2d at 81 (plaintiff's method of proving damages found to rely "too heavily on speculation and conjecture.").

### A. *Evidence of Lost Profits.*

#### 1. *The "Yardstick" Approach.*

At the time of the Journal's refusal to accept classified advertisements from rental referral businesses, Home Placement was a fledgling new business attempting to establish a foothold in the Rhode Island rental referral market. Due to the monopolistic behavior of the Journal, Home Placement operated as planned for only a few short weeks and ultimately failed in less than a year. Thus, to prove the amount of lost profits suffered as a result of the defendant's antitrust violation, Home Placement cannot rely on past earnings patterns or projections.[7] Instead, it must attempt to measure its damages with reference to the performance of one or more

---

[7]. The "before and after" method, another widely accepted means of proving lost profits in an antitrust case, "compares the plaintiff's profit record prior to the violation with that subsequent to it." *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir.1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975). This method, however, "is not easily adaptable to a plaintiff who is driven out of business before he is able to compile an earnings record sufficient to allow estimation of lost profits." *Id.*

closely comparable firms in the same industry that, unburdened by the proscribed anticompetitive activity, successfully managed to earn profits. *See Jay Edwards, Inc. v. New England Toyota Distributor,* 708 F.2d 814, 821 n. 6 (1st Cir. 1983); *Framington Dowel,* 421 F.2d at 82 & n. 48; *see also Park v. El Paso Board of Realtors,* 764 F.2d 1053, 1068 (5th Cir. 1985). Central to this so-called "yardstick" approach to proving antitrust damages is the requirement the plaintiff identify a sufficiently comparable firm (the "yardstick") against which it can measure its quantum of damages. Cases employing this approach have recognized that product, firm, and market comparability are all relevant factors in the selection of a proper yardstick and have also cautioned that the yardstick firm must be unaffected, one way or the other, by the defendant's antitrust violation. *See, e.g., Farmington Dowel,* 421 F.2d at 82 n. 48 (describing various factors affecting comparability).

Thus, in a case such as this one, a threshold question is whether there is ample evidence in the record as to the comparability of the plaintiff's business and the "yardstick" firm as to permit a legitimate comparison by the trier of fact. *See Jay Edwards,* 708 F.2d at 821 n. 6. If this question is resolved in favor of the plaintiff, then the trier of fact must proceed to calculate the amount of damages based on reasonable inferences drawn from the evidence and the defendant, whose wrongful conduct caused or contributed to the uncertainty of the damages sustained, cannot protest that such a measurement of damages is too imprecise. *See Wallace Motor Sales,* 780 F.2d at 1062 n. 4 (citing *Jay Edwards,* 708 F.2d at 821; *Bigelow,* 327 U.S. at 251, 66 S.Ct. at 574). If, however, the question is resolved in favor of the

defendant, then the plaintiff is entitled to nominal damages at most.

### 2. *Evidence of Comparability.*

Home Placement has attempted to prove lost profits by identifying the Homefinders franchisee located in Nashville, Tennessee as the appropriate yardstick for its own rental referral business in Rhode Island.[8] The only evidence in the record, however, consists of testimony from the earlier *Homefinders* trial that was designed to provide a basis for the district court's comparison of the Providence and Nashville Homefinders offices. Despite the fact that there had yet to be a determination as to whether even the two Homefinders franchisees were sufficiently comparable, no additional evidence directly bearing on the issue of whether Nashville Homefinders was sufficiently comparable to Home Placement was introduced at the *Home Placement* trial. Home Placement apparently believed that it could sit back at trial and rely solely on the original *Homefinders* record to satisfy its burden of presenting evidence from which the trier of fact could determine the amount of damages sustained. *See Bigelow,* 327 U.S. at 251, 66 S.Ct. at 574; *Ford Motor Co. v. Webster's Auto Sales, Inc.,* 361 F.2d 874, 885–86 (1st Cir.1966). As we shall explain, however, this was an ill-conceived strategy.

The crux of Home Placement's comparability evidence was the testimony at the *Homefinders* trial of Vincente Garcia, a certified public accountant and former employee of Homefinders. Garcia prepared a study comparing the Providence and Nashville Homefinders offices in an attempt to buttress Providence Homefinders' damage claim against the Journal. On the stand, he was questioned as to the relevant criteria that influenced his decision to choose the Nashville franchisee as the appropriate

---

**8.** For the purposes of this appeal, we assume as true Home Placement's allegation that it intended to serve not only West Warwick and Kent County, its initial base of operation, but the entire Providence-Pawtucket-Warwick Standard Metropolitan Statistical Area ("SMSA"). This area encompasses most of Rhode Island and a small slice of southeastern Massachusetts, and is more or less equivalent to the newspaper market found to be dominated by the Journal. Thus, we do not rest our determination as to the comparability of Home Placement and Nashville Homefinders on what the Journal characterizes as the inaccuracy in attempting to compare West Warwick, Rhode Island with Nashville, Tennessee or the entire Nashville-Davidson SMSA.

yardstick firm. His testimony focused on a series of factors such as the vacancy rate, the population, the total number of housing units, the total number of rental units, and the total number of available rental units in each of the relevant markets. Although these factors were not identical for Providence and Nashville,[9] Garcia testified that, of all the Homefinders franchisees in the country, the Nashville office operated in the market that was most comparable to that of the Providence office. Garcia also thought it relevant that both the Nashville and Providence agencies began to operate during the late summer and early autumn. This enhanced comparability of the data, according to Garcia, because the rental referral business "to a certain extent is very seasonal." Appendix at 813.

Aside from Garcia's less than illuminating testimony, the brief trial testimony of Home Placement's president, Muschiano, produced the only other evidence relied upon by Home Placement to support comparability in this case. Muschiano testified that he opened Home Placement as a rental referral agency in 1973 at the end of March or beginning of April. He also stated that, like Providence Homefinders, Home Placement charged an initial $20 fee to prospective tenants. According to Muschiano, Home Placement operated as planned for less than a month, because the Journal sent Muschiano a letter on April 13 informing him that it would no longer accept advertising for rental referral firms that required prospective tenants to pay an up-front fee. Muschiano claimed that Home Placement continued to operate, but had to abandon its practice of charging a fee so as not to jeopardize its opportunity to advertise in the Journal. This method of operation proved unworkable, however, and the business began to suffer severe cash flow problems. Muschiano testified that Home Placement finally closed its doors at the end of 1973 or the beginning of 1974.

■ After reviewing the sparse testimony regarding comparability in the record of this case, we cannot say that Home Placement has met its burden of introducing evidence sufficient to permit a trier of fact to ascertain the amount of damages by just and reasonable inference. First, while a close question, we doubt whether the testimony from the *Homefinders* trial purporting to establish the comparability of the two Homefinders franchisees is itself legally sufficient. The plaintiff in that case seems to have overlooked or simply omitted several factors relevant to a determination of market comparability. As defendant pointed out on cross-examination, plaintiff's witness, Garcia, did not consider the impact of industry, rental patterns, unemployment, summer rentals, and colleges when assessing the comparability of the two markets. There was also no mention of the relative competition in the rental referral industry in each market. It is at least conceivable that Providence Homefinders and Nashville Homefinders would have enjoyed different shares of their respective markets, especially given the entry of firms like Home Placement into the rental referral business in Rhode Island.

While the Journal could have aided its own cause significantly by offering evidence tending to establish relevant differences between the Providence and Nashville markets, the lack of contrary evidence does not necessarily establish that the two markets are comparable. The burden of proving comparability, while not particularly onerous, rests with the plaintiff and does not shift to the defendant after the plaintiff has offered some bits of evidence arguably tending to support comparability. Although we need not decide in the context of this appeal whether Nashville Homefinders was an appropriate yardstick for the case brought by Providence Homefinders

---

9. Nashville's vacancy rate was 7.2%, while Providence's was 5.8%. The population of the Nashville SMSA in 1970 was 699,271, as opposed to a population of 854,400 in the Providence SMSA. Nashville had 169,216 total housing units during the period in question, 62% of which were owner-occupied. By contrast, Providence had 285,- 026 total housing units, 59% of which were occupied by their owners. Nashville had 63,794 rental units and 4593 available rental units. Providence, on the other hand, had 116,860 rental units (almost twice as many), 6544 of which were available.

against the Journal, we do note that there are sufficient gaps in the proof regarding the respective markets to cast considerable doubt on whether the issue should be resolved in favor of comparability.

To this doubt, we add the inexplicable failure of Home Placement to introduce any evidence establishing its comparability with either Providence Homefinders or Nashville Homefinders. Even adopting the dubious assumption that the markets served by Home Placement and Nashville Homefinders are sufficiently comparable, we are further troubled by the dearth of evidence permitting a closer comparison of the two firms.[10] For instance, while Homefinders agencies were required to maintain a substantial reserve of working capital, *see Walker v. Providence Journal Co.*, 493 F.2d 82, 86 (1st Cir.1974), there is absolutely no mention of Home Placement's capital structure beyond Muschiano's statement that he originally invested $8000 or $10,000 in the venture. Nor is there any evidence comparing the organization and resources of the two firms, one of which was the franchisee of a national business operation and the other an independent, local agency. The lack of evidence on both of these points invites the trier of fact to speculate as to important indicia of comparability rather than draw reasonable inferences from the available evidence.[11]

Most significant in our view, however, is the complete lack of evidence supporting an inference that the two firms actually conducted business in a similar manner. It is not enough that Home Placement and Nashville Homefinders each offered rental referral services for a $20 fee unless there is some affirmative evidence to indicate that the two firms were administered and operated in the same way. This is critical because the Journal's antitrust liability in the instant case resulted from Home Placement's showing that, unlike Providence Ho-

mefinders, it did not resort to deceptive advertising practices to attract customers. *See Home Placement I*, 682 F.2d at 276. As we described in our original *Homefinders* opinion, Providence Homefinders routinely used false advertisements, " 'calculated to attract an unusual degree of attention,' " as bait to lure unsuspecting consumers to the agency. *Homefinders*, 621 F.2d at 442 (quoting 471 F.Supp. at 420). Once on the hook, the prospective tenant would be told that the attractive property advertised in the paper was no longer on the market, but that the agency would provide a list of available properties, purportedly similar to the advertised property, in exchange for a $20 fee. *Id.*

According to Muschiano, Home Placement operated in a manner entirely different from Providence Homefinders and, unlike its competitor, was never the subject of customer complaints to the Journal. Despite this attempt to distance itself from the tactics employed by the local Homefinders office, Home Placement has presented no evidence suggesting that its chosen yardstick, Nashville Homefinders, also operated differently from the Homefinders office in Providence. Indeed, the only evidence on this issue we have been able to glean from the record—the testimony of Larry Glist, president of Homefinders of America, to the effect that Homefinders franchises operated identically in each geographical location—gives us every reason to believe that the Nashville Homefinders employed the same deceptive tactics to generate business as Providence Homefinders. Appendix at 303. Home Placement has even stated in its appellate brief that the two Homefinders franchises "were interchangeably the same business operation." Appellant's Brief at 55.

Without some affirmative evidence in the record that a rental referral firm like Home

---

**10.** The issue of firm comparability was not explored in depth at the original *Homefinders* trial, presumably because both the plaintiff in that action and its chosen yardstick were franchisees of the same Denver-based organization and were assumed to be comparable solely based on the existence of that relationship.

**11.** Also, in light of Garcia's testimony that the comparability of the two Homefinders offices was enhanced by the fact that they both opened during the same season of the year, we note that while Home Placement began operations in the early spring of 1973, Nashville Homefinders opened its business in September of that year.

Placement could have succeeded during the mid–1970s without engaging in deceptive business practices, we cannot say that Home Placement has satisfied its burden, however slight, of introducing evidence sufficient to permit an award of damages based on reasonable inferences. This fact alone distinguishes the instant case from those cited by Home Placement in which courts have employed an arguably more liberal standard when reviewing comparability evidence offered by unestablished businesses attempting to prove damages using the yardstick method. *See Autowest Inc. v. Peugeot, Inc.,* 434 F.2d 556, 567 (2d Cir.1970) (evidence of increased sales of Volvos permitted to rebut contention that Peugeot distributor could not have been profitable); *William Goldman Theatres, Inc. v. Loew's, Inc.,* 69 F.Supp. 103, 107–09 (E.D.Pa.1946), *aff'd,* 164 F.2d 1021, 1022 (3d Cir.1947), *cert. denied,* 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948) (evidence of profits earned by nearby movie theatre permitted to establish plaintiff's damages despite significant differences between two theatres); *Wilko of Nashua, Inc. v. TAP Realty, Inc.,* 117 N.H. 843, 379 A.2d 798, 803 (1977) (evidence of profits earned by another local Kentucky Fried Chicken franchise permitted to establish lost profits of unestablished KFC franchise injured by breach of lease).

Accordingly, we believe that Home Placement's method of proving damages "relies too heavily on speculation and conjecture," *Farmington Dowel,* 421 F.2d at 81, and is not "sufficient to get the Court beyond the guessing stage." *William Goldman Theatres,* 69 F.Supp. at 106. For all the reasons elaborated above, we hold that Home Placement is entitled to no more than the nominal damages awarded by the district court on its claim for lost profits.

### B. *Evidence of Lost Investment.*

In addition to its principal claim of lost profits, Home Placement seeks to recover Muschiano's $8000 to $10,000 start-up investment. For this, Home Placement relies upon *Story Parchment,* 282 U.S. at 555, 51 S.Ct. at 248, and *Atlas Building Products Co. v. Diamond Block & Gravel Co.,* 269 F.2d 950 (10th Cir.1959), *cert. denied,* 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960), but both cases actually hold that recovery is proper only to the extent that a plaintiff can prove a diminution in the value of its initial investment. *See Story Parchment,* 282 U.S. at 567, 51 S.Ct. at 252; *Atlas Building Products,* 269 F.2d at 958–59 (instruction that jury "might also consider as another element of damages the extent to which ... the net worth of [plaintiff's] assets had been diminished" was proper).

Muschiano testified at trial that he spent between $8000 and $10,000 on furniture, equipment, and supplies for Home Placement's West Warwick office. There is no evidence in the record, however, that would indicate the impact of the antitrust violation on the value of this initial investment in the venture. Home Placement presumably used the equipment and supplies until it closed its doors at the end of 1973 or beginning of 1974, and then either sold these assets or converted them to some other use. As in the case of the lost profit evidence, the evidence of net lost investment is insufficient to permit a trier of fact to award damages without engaging in guesswork. We therefore decline to overturn the district court's decision to deny Home Placement's request for damages due to lost investment.

### III. *Attorney's Fees.*

The final matter at issue in this case is the district court's determination of attorney's fees. Judge Loughlin awarded Home Placement's attorneys a total fee of $74,055.16, an amount which the Journal challenges on two complementary bases. First, the Journal contends that the district court should not have awarded fees for work related to issues on which Home Placement did not prevail. Second, the Journal argues that the district court should have adjusted the fee award downward to avoid unreasonable compensation.

Section 4 of the Clayton Act provides that a person injured as a result of conduct forbidden by the antitrust laws "shall re-

cover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15. Similarly, a plaintiff who substantially prevails in an action for injunctive relief under the antitrust laws is entitled to "the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 26. In all successful antitrust cases, the award of reasonable attorney's fees as part of costs is mandatory in order to encourage private prosecution of antitrust violations by insulating plaintiffs' treble damage recoveries from the expense of legal fees. *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1312 (9th Cir.), *cert. denied*, 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982). Successful plaintiffs, however, must shoulder the burden of proving the amount of compensable time logged by their attorneys. *Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.*, 776 F.2d 646, 650 (7th Cir.1985). Without exception, the determination of the "reasonable attorney's fee" to be awarded is entrusted to the sound discretion of the district court, *Farmington Dowel*, 421 F.2d at 87, and we are thus free to overturn such a determination only upon a showing that the court abused its discretion or committed a clear error of law.

In the instant case, the district court appears to have employed the lodestar approach in calculating the appropriate fee award. *See generally Ohio-Sealy*, 776 F.2d at 651 (discussing appropriateness of lodestar approach in Clayton Act section 4 cases); *Grendel's Den v. Larkin*, 749 F.2d 945, 950–51 (1st Cir.1984) (discussing mechanics of lodestar approach). First, the court divided the litigation into two distinct time periods. For the period through 1982, when Home Placement was represented by only one counsel, the court allowed 296.7 of the 455.5 hours claimed. At the approved rate of $100 per hour, this yielded a lodestar for this period of $29,670. For the period commencing at the beginning of 1983, the court allowed 354.5 of the 486.1 hours claimed by attorney Gonnella at the rate of $115 per hour and 34 of the 34.8 hours claimed by attorney Labinger at the rate of $100 per hour. It also permitted recovery of costs totalling $217.66 claimed

by Labinger. Thus, the post–1982 lodestar was $44,385.16, resulting in a total of $74,055.16 for the entire length of the litigation. Overall, the court cut 291.2 (approximately 30%) of the hours claimed by Home Placement's attorneys in their fee application. After noting that it had already taken into account both the unduly prolonged nature of the litigation and the nominal damages obtained in arriving at the reasonable number of hours to be compensated, the court denied both parties' requests to adjust the lodestar amount.

■ The Journal complains primarily that the court erred in refusing to disallow more of the hours claimed for the phase of the litigation subsequent to the issuance of the injunction on November 10, 1983. Essentially, the Journal contends that the injunction marked Home Placement's only affirmative success in this case and that, therefore, Home Placement's attorneys are not entitled to any fees for the 355.5 hours of work incurred thereafter in an unsuccessful bid to secure a substantial damage award. While we agree that the recovery of only nominal damages can be cause for reducing a fee award if the litigation is not otherwise significant, we reject the Journal's contention that such limited recovery is a sufficient basis upon which to deny a fee award in its entirety. *See Perez v. University of Puerto Rico*, 600 F.2d 1, 2 (1st Cir.1979). As we noted in *Perez*, an award of only nominal damages "is a factor that may be considered on the amount of the award," but "[t]his does not mean that the fee award may also be nominal." *Id.* at 2 & n. 2. Here, because the district court explicitly found that the litigation failed to establish any principle of great importance, we believe that a reduction in the attorney's fee award is warranted. Our inquiry, therefore, must focus upon whether the district court sufficiently reduced the number of hours claimed by plaintiffs' counsel for work subsequent to the date on which the injunction issued.

Our first difficulty in making this assessment is that the district court did not specify the number of hours by which it reduced the total hours claimed for the period com-

mencing with the issuance of the injunction on November 10, 1983. All we are told is that the court cut approximately 132 hours from the 520.9 total hours claimed after January 1, 1983. This means that the court compensated plaintiffs' two attorneys for a *minimum* of 223 (or 63%) of the 355.5 hours claimed in the post-injunction period [12] and, theoretically at least, could have permitted compensation for all of the hours worked after November 10, 1983.[13]

The district court's cursory opinion is also silent as to whether specific hours claimed in the fee application were not allowed because they were deemed excessive, duplicative, or unreasonably spent. This is not beyond the realm of possibility, however. Attorney Gonnella alone, for instance, claims to have worked approximately 111 hours drafting a memorandum of law and a reply memorandum for Judge Loughlin concerning the sufficiency of Home Placement's damage evidence, an issue that presumably had already been briefed for the earlier remand before Judge Selya. It is conceivable, therefore, that the 132 hours cut from the post–1982 claim could have represented the court's attempt to trim the fat from the fee application rather than a reduction in hours premised upon plaintiff's limited success on the merits.

Faced with these uncertainties, we would normally be tempted to remand the case to the district court for further consideration of the fee applications. Indeed, the Journal has requested no more than a remand in its prayer for relief. This case has lingered far too long, however, and we fear that, given the parties' propensity to engage in protracted litigation, a remand at this time would inevitably result in yet another appeal to this court. The record before us, moreover, contains adequate material to permit determination of a fair and reasonable attorney's fee allocation in this case.[14] We have therefore opted to make our own modification of the fee award. *See Grendel's Den,* 749 F.2d at 947; *see also Souza v. Southworth,* 564 F.2d 609, 613–14 (1st Cir.1977).

We begin our calculation by assuming that the district court's reduction of the 520.9 post–1982 hours to 388.5 reflects an across the board cut of 25% for the entire period, rather than specific cuts in certain of the listed hours. We base this assumption on the absence of any indication that specific cuts were made and on the court's perfunctory explanation that it considered "the unduly prolonged litigation and the results obtained, nominal damages." This assumption, moreover, avoids the inherent bias of allocating the court's reductions in either of the extreme manners described above. *See supra* p. 1211 & notes 12, 13. Applying the 25% benchmark, we find that the district court reduced the 355.5 hours claimed for the period after the issuance of the injunction by only about 89 hours, an amount we deem insufficient in light of the excessive time claimed for the preparation of the memorandum of law and plaintiff's limited success on the merits. In our opin-

12. We reached this figure by assuming that all of the hours cut from the post–1982 total represented hours worked during the post-injunction period.

13. This result would follow if none of the reductions in the post–1982 total represented hours worked during the post-injunction period.

14. The Journal protests in its brief that the fee application filed by Home Placement's attorneys was defective because it was not accompanied by actual contemporaneous time records as required by New Hampshire Local Rule 39 and by the cases of this court. *See Grendel's Den,* 749 F.2d at 951; *Souza v. Southworth,* 564 F.2d 609, 612 (1st Cir.1977). The district court permitted an affidavit containing a compilation of hours to be submitted in lieu of attorney Gonnella's actual contemporaneous time records, which were at all relevant times available for inspection. The Journal claims to have inspected the contemporaneous records and to have raised objections as to their authenticity that were never resolved by the district court. It contends that the district court erred in relying on the affidavit and, as a result, awarded an excessive fee that included compensation for redundant and excessive work by plaintiff's counsel. However, in view of the district court's familiarity with the case and the parties, the Journal's failure to point out to this court the precise defects in the actual records or their impact on the issue of the proper fee to be awarded, and our ultimate decision to reduce the fee award for excessive work done on Home Placement's memorandum of law to the court below, *see infra* p. 1212, we refuse to hold that the district court's reliance on the compilation amounted to an abuse of discretion.

ion, the maximum reasonable amount that can be awarded for this time period can be determined only by, first, subtracting half the number of hours that attorney Gonnella claims to have spent researching and drafting the memorandum on the damage issue from the total number of hours claimed for this period, and second, reducing by half the total number of remaining hours to reflect the fact that approximately three years of counsels' efforts resulted in a recovery by Home Placement of only nominal damages. This approach finds support in the case law. *See Rosebrough Monument Co. v. Memorial Park Cemetery Association*, 572 F.Supp. 92, 94–95 (E.D.Mo.1983), *aff'd in relevant part*, 736 F.2d 441, 446 (8th Cir.), *cert. denied*, 469 U.S. 981, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984).

The formula we have outlined yields the following results. Adopting the district court's 25% reduction for those post–1982 hours worked prior to the issuance of the injunction, attorney Gonnella is entitled to compensation for 124 hours during the period from January 1, 1983 to November 10, 1983 (75% of his 165.4 hour claim). For the period after the issuance of the injunction, he is entitled to compensation for 132.6 hours. We arrived at this figure by reducing by half the number of hours claimed for research and writing of the memorandum and reply memorandum (55.5 hours) and subtracting this amount from the 320.7 hours claimed by attorney Gonnella for this period. This left attorney Gonnella with 265.2 hours for the post-injunction period, an amount we further reduced by half to account for the award of only nominal damages. Neither party has challenged the hourly rates employed by the district court in its computations, *see supra* p. 1210, so we adopt these figures to calculate the final tallies. Gonnella's maximum total award, therefore, is $59,179, reflecting the $29,670 awarded by the district court for the period through 1982 (296.7 hours at $100 per hour), $14,260 for work completed in 1983 prior to the issuance of the injunction (124 hours at $115 per hour), and $15,249 for work completed after the issuance of the injunction (132.6 hours at $115 per hour).

The calculation for attorney Labinger is simpler because all of her hours were compiled after the issuance of the injunction and, consequently, must be reduced by half. This results in an award of $1740 in attorney's fees (17.4 hours at $100 per hour). We will also permit the recovery of attorney Labinger's reasonable enumerated costs, found to be $217.66 by the district court, for a total award of $1957.66. Accordingly, we hold that the grand total of $74,055.16 awarded by the district court for attorney's fees and costs must be reduced to $61,136.66.

### IV. Conclusion.

We briefly summarize our holdings. First, the district court properly denied Home Placement's renewed motion for a new trial. Second, Home Placement failed to present evidence sufficient to justify an award of more than nominal damages and, therefore, the district court correctly entered judgment in favor of Home Placement in the amount of $1 trebled. Finally, the fee award must be reversed for abuse of discretion and remanded to the district court for a reduction of the award in the manner described in Part III of the opinion.

*Affirmed in part, reversed in part, and remanded with instructions. Each party to bear its own costs.*